BRIDGES, P.J.,
for the Court.
¶ 1. On March 18, 2003, an affidavit and application for commitment was filed in the Chancery Court of Kemper County. The petitioner, John Kenneth Briggs, Jr., alleged that the respondent, Kenneth Warren Bauman, was a person mentally ill as defined by law.
¶2. Subsequent to the filing thereof, Weems Mental Health Center was appointed and directed to perform a pre-evaluation screening into the mental condition of Bauman as required by statute. Following the pre-evaluation screening, Bauman was also examined by Dr. A.P. Soriano and Dr. Jose Paz. Reports from the pre-evaluation, as well as the certificates of examining physician from both Dr. Soriano and Dr. Paz were filed with the chancery court and made a part of the record.
¶ 3. On March 19, 2003, a hearing was held on this matter in the Chancery Court of Winston County. At the conclusion of the hearing, the chancellor found by clear and convincing evidence that Bauman constituted a danger to himself and was in need of inpatient mental treatment. However, due to lack of immediate available space at the East Mississippi State Hospital, the chancellor ordered that Bauman be temporarily held at the Willowbrook Mental Health Facility in Columbus, Mississippi, pending space becoming available at the State Hospital. Additionally, due to the late hour that the hearing concluded, Bauman was ordered to be held overnight at the Neshoba County General Hospital in Philadelphia, Mississippi, and to be transported to Willowbrook the following morning.
¶ 4. On April 2, 2003, Bauman was discharged from Willowbrook Mental Health Facility. The certificate of discharge was *1035 filed in the Kemper County Clerk’s Office on April 7, 2003, some three days after Bauman filed his notice of appeal.
STATEMENT OF THE ISSUES
I. WHETHER THE REPORTS OF THE PHYSICIANS ALONE WERE SUFFICIENT TO MEET THE BURDEN OF PROOF ON BEHALF OF THE PETITIONER
A. WHETHER THIS CASE FALLS UNDER THE EXCEPTION TO THE MOOTNESS DOCTRINE, “CAPABLE OF REPETITION YET EVADING REVIEW”
B. WHETHER MEDICAL REPORTS ARE SUFFICIENT TO ESTABLISH THE NEED FOR INVOLUNTARY MENTAL COMMITMENT
II. WHETHER THE STATE IS RESPONSIBLE FOR PROVIDING FOR THE CARE AND TREATMENT OF THOSE INVOLUNTARILY COMMITTED FOR INPATIENT MENTAL TREATMENT AT THE COST OF THE STATE, EVEN IN SITUATIONS IN WHICH THE DIRECTOR, AND/OR ANY AUTHORIZED AGENT THEREOF, OF THE APPLICABLE STATE HOSPITAL DECLARES THAT THERE WILL BE NO AVAILABLE SPACE FOR SUCH COMMITTED PERSON
III. WHETHER THE PERSON COMMITTED INVOLUNTARILY FOR INPATIENT MENTAL TREATMENT CAN BE REQUIRED TO BEAR FINANCIAL RESPONSIBILITY FOR THE COSTS OF HIS/HER PLACEMENT IN A PRIVATE FACILITY WHILE AWAITING AVAILABLE SPACE IN A STATE MENTAL HOSPITAL
FACTS
¶ 5. An affidavit and application for commitment was filed by John Kenneth Briggs, Jr., against Kenneth Warren Bau-man in the Chancery Count of Kemper County. The affidavit alleged numerous allegations, including that Bauman was mentally ill as defined by law and posed a substantial likelihood of physical harm to himself or others by a failure to provide necessary food, clothing, shelter, or medical care for himself. The affidavit further alleged that Bauman had refused to take medication which had been previously prescribed for him by a physician in Marion, Virginia, for a prior diagnosis of bipolar disorder. It was also alleged in the affidavit that Bauman had exhibited extremely poor sleeping habits in that he was sleeping on the floor, fully clothed, including outerwear clothing with a box over his head, and that Bauman refused to bathe, refused to change his clothes, and refused to eat.
¶ 6. Additionally, the affidavit included specific alleged actions by Bauman including that Bauman had been retrieved by law enforcement officers at 3:30 a.m., while walking down Highway 45 in Kemper County, Mississippi. Further, it is alleged that Bauman had been kneeling in front of Briggs’s convenience store crossing himself with the sign of the cross, and finally, that Bauman allegedly was having difficulty performing mundane chores due to his inability to remain focused.
¶7. The patient information portion of the affidavit and application, which was signed by Bauman’s father on March 18, 2003, noted that Bauman had previously been prescribed Lithium, but was inconsistent in taking the medication. The information form also stated that Bauman had two recent mental health commitments during the 2002 calendar year and also at least two mental commitments in the distant past.
*1036 ¶ 8. Additionally, the information form identified the problems that Bauman was experiencing at the time, to include difficulty sleeping or eating, as well as emotional problems and social relation disturbances with other family members and other people. It further stated that Bau-man was suffering from anxiety, fears, and phobias, and that he had stopped taking his medication and had exhibited management problems at home, as well as suffering social withdrawal, isolation, suspicions, delusions, anger and belligerence.
¶ 9. Thereafter, the chancery clerk executed an appointment for pre-hearing evaluation screening, which was conducted by Weems Mental Health Center which was instructed to make a full inquiry into the mental condition of Bauman. Additionally, the clerk executed two appointment of physician forms which instructed the physicians to make a thorough physical and mental evaluation of Bauman. The physicians appointed were Dr. A.P. Soriano and Dr. Jose Paz.
¶ 10. The pre-evaluation screening of Bauman was performed by E. Lee Steele at Weems Community Health Center on March 19, 2(103. The evaluation noted Bauman’s previous mental hospitalizations that occurred in both Marion, Virginia, and Cleveland, Ohio, within the last two years. Steele indicated that Bauman exhibited a failure to care for himself in that he was unable to provide necessary food, clothing, shelter, safety or medical care for himself. The evaluation also noted that Bauman suffered from antisocial/criminal behavior such as stealing, lying, excessive fighting, running away from home, family desertion, as well as using the assumed name of Joe Jackson. Steele also observed psychotic-like behavior such as disorganized speech, forgetfulness, disorientation, confusion, emotional turmoil, delusions and suspi-ciousness to name only a few examples. At the conclusion of the evaluation, Steele opined that Bauman was “in need of inpatient treatment, stabilization of medication (in which none at present time), monitoring of alcohol abuse and mental illness.”
¶ 11. On March 19, 2003, Dr. A.P. Sori-ano examined Bauman and completed the certificate of examining physician which certified that he conducted a thorough mental and physical examination of Bau-man, and also attached his report to the certificate. On the certificate, Dr. Soriano noted that recent behavior of Bauman included grossly disturbed behavior, substantial likelihood of physical harm to self or others and a failure to provide necessary care for himself. In his personal handwritten report, that was attached to the certificate, Dr. Soriano noted that Bau-man had a very demanding, belligerent attitude and refused to answer direct questions; rather, Bauman stated he did not want to answer the question because, “it is not relevant to payment.” Dr. Soriano concluded that Bauman suffered from schizophrenia and manic depression and was in need of psychiatric treatment.
¶ 12. Bauman was also examined by Dr. Jose Paz, who also completed his certificate of examining physician which certified that he conducted a thorough mental and physical examination of Bauman. Like Dr. Soriano, Dr. Paz also attached a personal handwritten report to the certificate. Similar to Dr. Soriano, Dr. Paz certified that Bauman’s recent behavior included grossly disturbed behavior and also a failure to provide necessary care for self. Dr. Paz also concluded in the certificate that Bauman posed a substantial likelihood of physical harm to himself because he was disconnected to reality. In his handwritten report, Dr. Paz observed that Bauman looked poorly kept and reiterated that he appeared to be, “disconnected from reality,” and that while Bauman did not appear *1037 to be dangerous to others, he was certainly not capable of taking care of himself.
¶ 13. A hearing was conducted on March 19, 2003, where the reports of both physicians as well as the pre-evaluation form were admitted into evidence in lieu of live testimony. Briggs also had several lay witnesses testify on his behalf. At the conclusion of the hearing, the chancellor found by clear and convincing evidence that Bauman constituted a danger to himself and was in need of inpatient mental treatment. However, due to lack of immediate available space at the East Mississippi State Hospital, the chancellor ordered that Bauman be temporarily held at Wil-lowbrook Mental Health Facility in Columbus, Mississippi, pending space available at the State Hospital. Additionally, due to the late hour in which the hearing concluded, Bauman was further ordered to be held overnight at the Neshoba County General Hospital in Philadelphia, Mississippi, and to be transported to Willowbrook the next day. Both the overnight commitment to the Neshoba County General Hospital and the temporary commitment to Willow-brook were to be at the expense of Bau-man’s private insurance.
¶ 14. On April 4, 2003, Bauman was discharged from Willowbrook Mental Health Facility. The certificate of discharge stated that Bauman had been diagnosed with bipolar disorder-manic in nature, but no longer posed a substantial threat of physical harm to himself or others at that time. The certificate also noted that Bauman was discharged to his brother and that Bauman was to return to Virginia, his home at that time, with the understanding that he would undergo outpatient care in Virginia. The certifícate was filed in the Kemper County Clerk’s Office on April 7, 2003, some three days after Bauman filed his notice of appeal.
ANALYSIS
I. WHETHER THE REPORTS OF THE PHYSICIANS ALONE WERE SUFFICIENT' TO MEET THE BURDEN OF PROOF ON BEHALF OF THE PETITIONER.
A. WHETHER THIS CASE FALLS UNDER THE EXCEPTION TO THE MOOTNESS DOCTRINE, “CAPABLE OF REPETITION YET EVADING REVIEW.”
¶ 15. Bauman, as well as Briggs, submit that the question being placed before this Court concerning whether Bau-man’s involuntary mental commitment was supported by substantial evidence and is a moot point. The lower court ordered Bau-man to be committed involuntarily on March 18, 2003, and he was released sixteen days later from the Willowbrook Mental Health Facility on April 4, 2003, without ever having actually been admitted to the East Mississippi State Hospital. Bauman argues that the case sub judiee should not be considered moot as it is a matter of public interest and contends that his case falls within the purview of the “capable of repetition yet evading review” doctrine which was adopted in Strong v. Bostick, 420 So.2d 1356, 1358-59 (Miss. 1982). See also Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350, (1975). In Strong, the Supreme Court held that this exception to the moot doctrine was limited to situations where:
(1) The challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and
(2) There was a reasonable expectation that the same complaining party would be subject to the same action again.
Strong, 420 So.2d at 1359 (quoting Weinstein, 423 U.S. at 149, 96 S.Ct. 347).
*1038 ¶ 16. Briggs argues in his brief that, although this is sound jurisprudence, the two elements are not found in the case sub judice. He claims that while the first element of the requirement might arguably have been met since Bauman’s stay at the Willowbrook Mental Health Facility was ultimately rather short in duration, the second required element is simply not present. Briggs states that there is no “reasonable expectation” that Bauman would be subject to the same action at a later date because Bauman was released from Willowbrook Mental Health Facility with the intention to return to his home in Virginia and that he was simply a temporary resident of the State of Mississippi at the time the commitment proceeding was held.
¶ 17. This Court finds that Briggs’s contention that Bauman is a temporary resident of Mississippi is just an assumption made on the basis of one statement to a discharging doctor. There is simply no indication or guarantee that Bauman will never return to Mississippi. Further, there is no proof in the record that Bau-man has left the State of Mississippi. There is also the fact that Briggs, a close cousin of Bauman, resides in Kemper County, Mississippi, as does Bauman’s aunt, with which he also resided. It cannot be stated with the certainty inferred by Briggs, that Bauman would never return to this state. Thus, there is a “reasonable expectation that the same complaining party would be subject to the same action.” Strong, 420 So.2d at 1359.
¶ 18. In addition, this Court finds the case sub judice to involve a question affecting the public interest. As the Mississippi Supreme Court stated, “there is an exception to the general rule as respects moot cases, when the question concerns a matter of such a nature that it would be distinctly detrimental to the public interest that there should be a failure by the dismissal to declare and enforce a rule for future conduct.” Allred v. Webb, 641 So.2d 1218, 1220 (Miss.1994). Therefore, it is necessary that this Court address the question affecting the public interest and make a decision thereon. Accordingly, we hold that this appeal is one of public interest and, thus, we will entertain Bauman’s appeal.
B. WHETHER MEDICAL REPORTS ARE SUFFICIENT TO ESTABLISH THE NEED FOR INVOLUNTARY MENTAL COMMITMENT.
¶ 19. It is well established in Mississippi that a chancellor’s findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. “This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.” Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 9)(Miss.2002) (quoting Kilpatrick v. Kilpatrick, 732 So.2d 876, 880 (Miss.1999)); see also Harvey v. Meador, 459 So.2d 288, 293 (Miss. 1984).
¶20. The Mississippi Code specifically states that a “mentally ill person” includes any person who:
has a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which (i) is manifested by instances of grossly disturbed behavior faulty perceptions; and (ii) poses a substantial likelihood of physical harm to himself or others as demonstrated by (A) a recent *1039 attempt or threat to physically harm himself or others, or (B) a failure to provide necessary food, clothing, shelter or medical care for himself, as a result of the impairment. “Mentally ill person” includes a person who, based on treatment history and other applicable psychiatric indicia, is in need of treatment in order to prevent further disability or deterioration which would predictably result in dangerousness to himself or others when his current mental illness limits or negates his ability to make an informed decision to seek or comply with recommended treatment.
Mississippi Code Annotated Section 41-21-61(e) (Rev.2001).
¶ 21. Bauman states that he did not meet the above-noted definition for a mentally ill person for an involuntary commitment. Bauman was examined by two doctors, Drs. A.P. Soriano and Jose Paz, in compliance with the statutory requirements. Not only did each doctor present a certificate of examining physician to the court as required by statute, but each doctor also submitted detailed office notes concerning Bauman’s evaluation. Both doctors stated that Bauman posed a substantial likelihood of harm to himself, and that he should be committed to a treatment facility. After a thorough review of the record, we find that there was certainly sufficient medical evidence to meet the statutory requirements for Bauman to be committed under the provisions of the Mississippi Code Annotated Section 41-21-61, et seq. Although the chancellor may not have made findings pursuant to the above stated statute, we also find that the record, as well as certificates submitted by both doctors, are sufficient to support the chancellor’s findings. Therefore, we find this issue to be without merit.
II. WHETHER THE STATE IS RESPONSIBLE FOR PROVIDING FOR THE CARE AND TREATMENT OF THOSE INVOLUNTARILY COMMITTED FOR INPATIENT MENTAL TREATMENT AT THE COST OF THE STATE, EVEN IN SITUATIONS IN WHICH THE DIRECTOR, AND/OR ANY AUTHORIZED AGENT THEREOF, OF THE APPLICABLE STATE HOSPITAL DECLARES THAT THERE WILL BE NO AVAILABLE SPACE FOR SUCH COMMITTED PERSON.
III. WHETHER THE PERSON COMMITTED INVOLUNTARILY FOR INPATIENT MENTAL TREATMENT CAN BE REQUIRED TO BEAR FINANCIAL RESPONSIBILITY FOR THE COSTS OF HIS/HER PLACEMENT IN A PRIVATE FACILITY WHILE AWAITING AVAILABLE SPACE IN A STATE MENTAL HOSPITAL.
¶ 22. Additionally, Bauman argues that there was no authority for the chancellor to determine in advance that the facility was full, that a private facility must be used, and that Bauman may then be made financially responsible initially for the payment of the costs of such a commitment to a private facility.
¶ 23. Bauman was committed for treatment through the office of the Chancery Clerk of Kemper County, Mississippi, and was ordered to be placed and treated in a state institution, East Mississippi State Hospital in Meridian, Mississippi. Although Bauman was first sent to Neshoba County General Hospital overnight, he was then transported to a temporary facility, Willowbrook, until he could be permanently placed for treatment in said state institution. Soon thereafter, Bauman was discharged apparently before any further treatment, such discharge being as a result of a doctor’s release of Bauman. Because *1040 Bauman did not voluntarily commit himself and because he was released prior to undergoing the usual treatment prescribed for patients of this kind, he should not be required to pay the expenses incurred. Therefore, all costs should be assessed to Kemper County, Mississippi.
¶ 24. The Mississippi Legislature has provided that
The State Insane Hospital at Whitfield, and the East Mississippi State Hospital at Meridian, are established for the care and treatment of lunatics and insane persons, free of charge, except as otherwise provided.
Miss.Code Ann. § 41-17-1 (Rev.2001) (emphasis added).
¶ 25. THE JUDGMENT OF THE KEMPER COUNTY CHANCERY COURT IS AFFIRMED IN PART AS TO ISSUE I AND REVERSED AND RENDERED IN PART AS TO ISSUES II AND III. COSTS OF THIS APPEAL ARE ASSESSED TO KEMPER COUNTY.
KING, C.J., LEE, IRVING, AND MYERS, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SOUTHWICK, P.J., AND CHANDLER, J.