976 So.2d 372 (2008)
Thelma KOESTLER, Appellant
v.
Marilyn Elizabeth KOESTLER, Appellee.
No. 2006-CA-01959-COA.
Court of Appeals of Mississippi.
March 4, 2008.
*374 Marcie Tanner Southerland, Vicksburg, Sharon Anglin Counts, Jennifer Powell Fortner, attorneys for appellant.
No Brief Filed, attorney for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. Marilyn Elizabeth Koestler successfully petitioned the Hinds County Chancery Court to have her mother, Thelma Koestler, involuntarily committed to the Mississippi State Hospital at Whitfield (Whitfield). Thelma was discharged just days after she arrived at Whitfield. Thelma appeals and raises several issues centered on the prospect that the chancellor erred when he granted Marilyn's petition to have Thelma committed. After careful consideration of a very sparse record, we find the chancellor erred. Accordingly, we reverse the chancellor's judgment and render judgment for Thelma.

FACTS AND PROCEDURAL HISTORY
¶ 2. Thelma admitted herself in the Senior Behavioral Health Services wing of the Mississippi Baptist Memorial Hospital (Baptist). Though there are various allegations regarding Thelma's mental health, it seems undisputed that Thelma was depressed because Leo, her husband of more than fifty years, had been diagnosed with terminal cancer.
¶ 3. On October 11, 2006, Thelma's daughter, Marilyn, filed an application and affidavit to commit Thelma. By her affidavit, which we quote in its entirety with its original capitalization, Marilyn submitted:
CLIENT IS PRESENTLY AT BAPTIST GERI-PSYCH UNIT. DR. COOK HAS FOUND THAT CLIENT IS INCOMPETENT AND IS RECOMMENDING COMMITMENT. HUSBAND RECENTLY DIAGNOSED WITH CANCER. CLIENT IS MISMANAGING MEDICATION FOR HUSBAND. SHE HAS ADMITTED SUICIDAL THOUGHTS, EITHER WITH GUN OR OVERDOSE. PRESENT SYMPTOMS: THREAT TO OTHERS AND TO SELF; AGGRESSIVE, MANIPULATIVE, PARANOID. PREVIOUS TREATMENT: SOME ONE-ON-ONE COUNSELING WHICH SHE DIDN'T PURSUE. MEDICALS: KNEE PROBLEMS. RISK OF VIOLENCE AND SUICIDE.
On October 16, 2006, the Hinds County Chancery Clerk filed a writ to take Thelma into custody and retain custody of her at the Hinds County Detention Center (HCDC). The writ indicates that Thelma was taken into custody on that date.
¶ 4. On the same day, the chancellor (1) appointed an attorney to represent Thelma, (2) ordered a pre-evaluation of Thelma, (3) appointed Doug Packer, M.D., and psychologist David Powers, Ph.D., to examine Thelma, and (4) assigned a special master to conduct a hearing as to whether Thelma should be involuntarily committed. At some point that same day, Thelma received *375 notice that a hearing would take place at noon on that day.
¶ 5. That morning, Hinds Behavioral Health Services (HBHS) conducted a pre-evaluation of Thelma and found: (1) Thelma was not a threat to herself or others; (2) she was able to take care of herself; (3) she exhibited no antisocial or criminal behavior; (4) she did not abuse alcohol or drugs; and (5) she had no manic, psychotic, or dementia-like behavior. The pre-evaluation further indicated that Thelma was depressed because Leo was dying of cancer, and Thelma might have been suffering from "caretaker's stress." Ultimately, HBHS recommended that Thelma be monitored on an outpatient basis because she was no danger to herself or others.
¶ 6. At noon, the special master conducted the ultimate hearing on Marilyn's petition for commitment. Four people testified during the hearing: (1) Dr. Packer; (2) Tiffany Parker, a social worker with the "geri-psych" unit at Baptist; (3) Dr. Powers; and (4) Thelma. Dr. Packer did not testify as to Thelma's mental health and did not recommend any course of action as to whether Thelma should be committed.
¶ 7. Parker testified as to Dr. William Cook's opinions and recommendations as to whether Thelma should be committed. To be specific, Parker read a letter from Dr. Cook into evidence. Counsel for Thelma objected and argued that Dr. Cook's letter was inadmissible hearsay. The special master overruled Thelma's objection and allowed Parker to read Dr. Cook's letter into the record. That letter reads as follows:
To Whom It May Concern,
Thelma Koestler was admitted October 2, 2006 for treatment for depression, suicidal ideations and delusions. She has a history of poor compliance with her medication and a higher level of treatment was indicated. Her husband is dying of cancer and has been given approximately six months to live.
Based on my inpatient psychiatric evaluation so far has [sic] the following diagnoses:
1. Major Depressive Disorder, recurrent, severe
2. Severe Borderline Personality Disorder
3. Cognitive Disorder, Not Otherwise Specified
It is my understanding that Mrs. Koestler adjusted her husband's medications without physician approval. These adjustments apparently worsened his quality of life. It is also my understanding that her husband has been doing much better while is [sic] in the hospital and not acting as his caregiver. Individuals with Borderline Personality Disorder can appear calm at times and then extremely rageful in a few seconds. The prognosis is extremely poor, even with ongoing psychiatric treatment.
Based on my understanding of Mrs. Koestler, the family dynamics and the prognosis for her psychiatric illness I would recommend that Mrs. Koestler visit her husband only under the supervision of a competent family member. I do not feel that Mrs. Koestler is competent, at this time, to make decisions for her medical care, or financial decisions.
¶ 8. After Parker read Dr. Cook's letter into the record, the special master asked Parker, "Can you briefly tell me what Dr. Cook has said and what his opinions are with regard to her commitment?" Parker responded:
Yes, sir. He has diagnosed her with major depressive disorder, recurrent, and severe cognitive disorder, not otherwise specified, as an Axis 1 diagnosis. *376 Severe borderline personality disorder as an Axis II diagnosis. And he feels at this time Ms. Koestler is not competent and does not show any insight into her illness, and his recommendation is for her to receive treatments  more long-term treatments  than our facility can provide at the state hospital.
As to whether Thelma was a danger to herself or others, Parker testified, "She is incompetent to make decisions regarding to her medical care. In light of that, she might potentially be a harm to herself due to confusion."
¶ 9. Thelma's attorney cross-examined Parker. During cross-examination, Parker testified that Dr. Cook did not clarify what kind of medical treatment Thelma was incompetent to decide. Parker explained, "[Dr. Cook] just is making general terms regarding her well being might not. [sic] She's already asked to go AMA and he feels like she needs continued treatment and he doesn't feel that she's competent to make that [decision]." Parker further testified, "We've been told that she has withheld medicine for her husband who has got [sic] lung cancer." Parker elaborated that she had no personal knowledge that Thelma withheld medicine from Leo because "[t]hat's only what we've been told." Parker noted that Thelma had never attempted suicide and that Thelma could feed and clothe herself "with some assistance." When Parker testified that Thelma "needs either supervision to moderate assistance with her daily living skills," counsel for Thelma asked Parker to elaborate. Parker testified, "cooking and that type of thing, just to make sure the stove gets turned off and that type of thing."
¶ 10. Dr. Powers testified after Parker. Dr. Powers testified that he "briefly" had an opportunity to conduct a mental examination of Thelma. During Dr. Powers's testimony, the following exchange between Parker, presumably in the audience, and Dr. Powers transpired:
Dr. Powers: Do you know to what [Dr. Cook] refers in cognitive disorder [sic]? We're missing that one altogether.
Parker: It's  he says  his diagnosis, cognitive disorder, not otherwise specified.
Dr. Powers: What did he mean by that, do you think?
Parker: A cognitive disorder not other than  other than dementia.
Dr. Powers: Do you think there's been some damage done to her thinking? I'm just curious more than anything else on that one 
Parker: Yes, sir. I haven't  all of our patients have an MRI, but I haven't seen or read the results of that, so I'm not 
Dr. Powers: Thank you.
After that exchange, Dr. Powers testified:
We have basically deferred to her treating psychiatrist. We have a letter from Dr. Cook indicating he believes she needs to be in the hospital for an extended period of time, I assume to get her stable on her meds. We defer to him. He's been seeing her every day. We've recommended inpatient care. That would be the least restrictive. The prognosis is guarded.
¶ 11. During cross-examination, Dr. Powers testified, "If I didn't have [Dr. Cook's] letter, [outpatient treatment] would have been my recommendation." Dr. Powers elaborated that his recommendation of commitment was based solely on Dr. Cook's letter and the "testimony of the *377 affiant."[1]
¶ 12. Though Marilyn filed the application and affidavit for commitment, neither she nor her brother, Carl, testified. Thelma was the final witness. Thelma testified that she "[h]adn't planned to" hurt herself or anyone else. She testified that she was able to take care of herself, and she was "more confused and frustrated than anything." She did not remember withholding any medication from Leo. She testified that she took care of Leo all the time until "two weeks ago."
¶ 13. Thelma's attorney asked her if there was anything else she wanted to tell the special master. At that point, the following exchange transpired:
Thelma: Well, I have a lot of things to tell you but I'm so frustrated and upset right now I can't even begin to guess where to start. This letter that Dr. Cook said the thing about me adjusting her husband's medication without physical or physician approval, I don't know what that means. I don't know what they're referring to. I don't know what cognitive disorder means. Oh, no, I can't take care of myself, right? Is that what she's saying?
The Court: I think  honestly, I think that letter's poorly worded. I don't think that the doctor's trying to say that you're totally incompetent. I think there is some concern by Dr. Cook and your family members, that you could benefit from getting your medication. I'm sure it's been a strain on you with your husband just recently being diagnosed with cancer. What he's saying is he thinks that you need to be in the hospital so that you can get a little bit more leveled out and that it could be  I don't think anybody's talking about any kind of long-term situation or that you're incompetent in the way that all of us think of that. I think it's more  and also this about your family, your family  I've talked to all of your family members and they love you very much and they're here because they're concerned, not trying to take anything away from you but rather to get you back and to do what they think is in the best interest of you and your husband.
Thelma: Well, the problem  can I talk to you?
The Court: Yes, ma'am.
Thelma: The problem is, when my husband was diagnosed with cancer, the doctor said that he had 9 to 12 months to live, and he took chemo and he took three treatments and he couldn't take it any more and he's been off of it now for a good while and they haven't taken another scan. So we don't know how long my husband's going to live.
The Court: Well, let me ask you this. Would you be willing to just to go back to Baptist? And I believe that if you'll just do what they ask you to do, it won't be a very long stay. That would be 
Thelma: Well 
The Court:  in my opinion the best thing to do.

*378 Thelma:  I'm scared to death my husband's going to die while I'm not there.
The Court: Yes, ma'am. Well, I understand that and I don't know what to do. Mr. Barnett [counsel for Thelma], based on this letter of Dr. Cook, again I don't  it's the thing, I'm going to find that she needs just to go back out to Baptist Hospital. I'm going to talk to the Court about make [sic] sure there's not other  I don't  there's some other things in this order that I want to take out that we can talk about later. But, anyway, that's going to be the ruling of the Court and I think this is in your best interest. And I think if you'll just do what they tell you there and everything, they're not  they're going to try to get you back and back home. That's what they're here to do. They're not trying to keep people that 
Thelma: How long am I going to have to stay there?
The Court: I'm just a lawyer. I don't know. I have no idea, so. It depends on you. And you seem like an intelligent lady who will do what they tell you to do and that's what we need to do. Okay? Thank you, ma'am. Thank you, Mr. Barnett.
¶ 14. The chancellor entered an order of commitment, and Thelma returned to Baptist where she waited for a bed to become available at Whitfield. On October 24, 2006, Thelma was transferred to Whitfield, where she underwent further psychological testing.
¶ 15. According to Thelma's brief, on November 2, 2006, Dr. Sharon Martin conducted a family conference at Whitfield.[2] Dr. Martin informed Thelma's family that Thelma would be released the next day pursuant to a provisional discharge. According to Thelma, Dr. Martin said she should have never been committed to involuntary inpatient treatment. Thelma's brief also states that Dr. Martin observed questionable motives for having Thelma involuntarily committed.

STANDARD OF REVIEW
¶ 16. We will not disturb a chancellor's findings of fact unless they are not supported by substantial evidence. Pacheco v. Pacheco, 770 So.2d 1007, 1009(¶ 8) (Miss.Ct.App.2000). Additionally, we will not disturb a chancellor's findings unless they were manifestly wrong or clearly erroneous. Vaughn v. Vaughn, 798 So.2d 431, 433(¶ 9) (Miss.2001). We review questions of law de novo. Ladner v. Necaise, 771 So.2d 353, 355(¶ 3) (Miss.2000).

ANALYSIS
¶ 17. Before we delve into Thelma's issues on appeal, we must discuss the fact that Marilyn did not file a response brief. Under the circumstances, we have two alternatives:
When the record is complicated or of large volume, and the case has been thoroughly briefed by appellant with a clear statement of the facts, and with applicable citations of authorities, so that the brief makes out an apparent case of error, we will not regard ourselves as obliged to look to the record or to search through it to find something by which to avoid the force of appellant's presentation, but will accept appellant's brief as confessed and will reverse. Or when the record is in such condition that we can conveniently examine it, and *379 when upon such an examination we can readily perceive a sound and unmistakable basis or ground upon which the judgment may be safely affirmed, we will take that course and affirm, thereby to that extent disregarding the default of appellee. But when, taking into view the argument presented by appellant, the basis or grounds of the judgment, and the facts in support of it are not apparent, or are not such that the court could with entire confidence and safety proceed to affirmance, the judgment will be reversed without prejudice.
Ballard v. Bingham, 919 So.2d 104, 105(¶ 5) (Miss.Ct.App.2005) (citing W.T. Raleigh Co. v. Armstrong, 165 Miss. 380, 382, 140 So. 527, 527-28 (1932)).
¶ 18. The record before us is very brief. The court papers consist of forty-one pages, and the transcript is only thirteen pages long. Suffice it to say, the record is in a condition that allows for convenient examination. Therefore, we will not accept Thelma's brief "as confessed" and reverse. That is, we will consider the merits of Thelma's claims, and we will not find that Marilyn has defaulted.
I. WHETHER THIS ACTION FALLS UNDER THE EXCEPTION TO THE MOOTNESS DOCTRINE, "CAPABLE OF REPETITION YET EVADING REVIEW."
¶ 19. Because Thelma was discharged from Whitfield, she concedes that her appeal could be considered moot. In general, we will dismiss an appeal "when no useful purpose could be accomplished by entertaining it, when so far as concerns any practical ends to be served the decision upon the legal questions involved would be merely academic." Strong v. Bostick, 420 So.2d 1356, 1359 (Miss.1982) (citation omitted).
¶ 20. There are exceptions to that general rule. Thelma submits that her appeal falls under one of those exceptions. We may entertain moot appeals if a matter is "capable of repetition yet evading review." See In re Bauman, 878 So.2d 1033, 1037(¶ 15) (Miss.Ct.App.2004). There are two qualifiers to a finding that a moot appeal is capable of repetition yet evading review: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again. Id.
¶ 21. Bauman was a civil commitment action. Id. at 1035(¶ 5). The appellant had been committed and then subsequently discharged. Id. at 1037(¶ 14). This Court found that, though the appellant was discharged prior to his appeal, his appeal fell under the capable of repetition yet evading review exception. Id. at 1038(¶ 17).
¶ 22. We follow the precedent we set in Bauman and find that Thelma's appeal falls squarely under the "capable of repetition yet evading review" exception to the mootness doctrine. Thelma's commitment was very brief. She did not have time to appeal before her discharge. Further, there is a reasonable expectation that Thelma could be subject to the same action. According to Thelma's brief, during her confinement at Baptist and Whitfield, Thelma's children successfully filed a petition for conservatorship over her. Thelma also claims she was removed as the beneficiary of Leo's life insurance and removed as the executrix of Leo's will. While we do not find that these matters occurred as a matter of fact, such a finding is not as pertinent to our present purposes as is the possibility that Thelma could be subject to the same action. Considering Dr. Martin's concern regarding the "questionable motives" *380 behind Thelma's commitment and the lack of an opposing argument, we find that this matter falls within the previously-mentioned exception to the mootness doctrine. Accordingly, we will consider the merits of Thelma's arguments on appeal.
¶ 23. To be entirely clear, this opinion is in no way to be construed as establishing a bright line rule. That is, we do not find as a matter of law that when an individual is committed, subsequently discharged, and then later appeals, that his or her appeal automatically falls within the exception discussed above. We merely find that Thelma's appeal falls within this exception.
II. WHETHER THIS COURT SHOULD REVIEW THIS INVOLUNTARY COMMITMENT BASED UPON THE "PLAIN ERROR" DOCTRINE.
¶ 24. Thelma notes that, in many instances, her counsel at the hearing failed to object to certain arguments that she raises for the first time on appeal. According to Thelma, we should review those arguments under the plain error exception to the contemporaneous objection rule. Because our finding, to some degree, depends on the nature of the argument, we will consider this issue as we consider those issues that Thelma raises for the first time on appeal.
III. WHETHER THE CHANCERY COURT ERRED IN ALLOWING INTO EVIDENCE THE HEARSAY LETTER WRITTEN BY DR. WILLIAM COOK, JR.
¶ 25. Thelma claims the special master erred when he allowed Parker, a social worker, to read Dr. Cook's letter into evidence. We quoted Dr. Cook's letter above, so there is no need to repeat it here. In any event, Thelma objected and submitted that Parker was prohibited from reading Dr. Cook's letter into evidence because it was inadmissible hearsay. The special master overruled Thelma's objection without elaborating as to why he found it permissible for Parker to read Dr. Cook's letter into evidence. Thelma claims the special master erred. We agree.
¶ 26. We review a trial court's decision regarding the admission of evidence for abuses of discretion. Burton v. State, 875 So.2d 1120, 1122 (¶ 6) (Miss.Ct. App.2004). In other words, we will not disturb a trial court's decision unless it is clearly wrong. Id. We will find an abuse of discretion if a party shows clear prejudice resulting from an undue constraint on his or her own case or an undue lack of constraint on the opposing party. Id.
¶ 27. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c) (internal quotations omitted). "A `statement' is . . . an oral or written assertion." M.R.E. 801(a)(1). Dr. Cook's letter is most definitely a written assertion. It follows that Dr. Cook's letter qualifies as a statement.
¶ 28. Dr. Cook did not testify at the hearing. Parker read Dr. Cook's letter into evidence. Accordingly, Dr. Cook's letter was a statement "other than one made by the declarant while testifying at the . . . hearing." What is more, Dr. Cook's letter was offered in evidence to prove the truth of the matter asserted  that Thelma should be committed to inpatient treatment. We must find that Dr. Cook's letter falls within the definition of hearsay. "Hearsay is not admissible except as provided by law." M.R.E. 802.
¶ 29. What is more, "[l]etters that are written specifically for litigation purposes *381 stating that a party to a trial is competent, incompetent, sane or insane are hearsay when offered as evidence unless accompanied by the testimony of the declarant." Rice v. State, 815 So.2d 1227, 1229(¶ 9) (Miss.Ct.App.2001). There can be no doubt that Dr. Cook's letter was written specifically for litigation purposes. Dr. Cook addressed his letter "To Whom it May Concern." It is dated October 13, 2006  the same date the chancellor directed the chancery clerk to issue the writ to take Thelma into custody. Within the letter, Dr. Cook specifically recommended that Thelma undergo inpatient treatment at the "MS State Hospital." Even during civil commitment proceedings, "[t]he rules of evidence applicable in other judicial proceedings shall be followed." Miss.Code Ann. § 41-21-73(3) (Rev.2005). We find that the special master abused his discretion when he allowed Parker to read Dr. Cook's letter into evidence.
¶ 30. It is not enough that we find that the special master erred. To find reversible error, we must find that Thelma experienced prejudice as a result of the special master's error. Thelma most definitely experienced prejudice as a result of the special master's decision to allow Parker's reading of Dr. Cook's letter. The only inpatient treatment recommendation was by way of Dr. Cook's letter. HBHS's pre-evaluation report recommended outpatient treatment. As detailed above, had Dr. Powers not been aware of Dr. Cook's opinion, Dr. Powers would have recommended that Thelma undergo outpatient treatment. It is readily apparent that, but for the special master's decision to admit Dr. Cook's letter into evidence through Parker, there would have been no recommendation for inpatient treatment. We find that the special master abused his discretion and committed reversible error when he allowed the presentation of the evidence at issue.
¶ 31. Without Dr. Cook's letter, it is impossible that there could be clear and convincing evidence that Thelma should be committed to involuntary inpatient treatment. Clear and convincing evidence is so clear, direct, weighty, and convincing that it enables "the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." Moran v. Fairley, 919 So.2d 969, 975(¶ 24) (Miss.Ct.App.2005) (quoting Travelhost, Inc. v. Blandford, 68 F.3d 958, 960 (5th Cir.1995)). "Clear and convincing evidence is such a high standard that even the overwhelming weight of the evidence does not rise to the same level." Id. Suffice it to say, a complete lack of evidence does not rise to the level of clear and convincing evidence.
¶ 32. The dissent would find that Dr. Cook's letter was properly received into evidence by way of Dr. Powers, who relied on the substance of Dr. Cook's letter in forming his own opinion. While Mississippi Rule of Evidence 703 allows an expert to use certain other sources in forming his or her own opinion, Rule 703 is not a vehicle for admissibility of otherwise inadmissible evidence. M.R.E. 703. Moreover, it is not intended to allow an expert to abdicate his or her opinion or defer his or her opinion to that of another expert.
¶ 33. What is more, Dr. Powers did not base his opinion solely on Dr. Cook's letter. For clarification of Dr. Cook's letter, Dr. Powers had a running colloquy with Parker, the social worker who had earlier impermissibly read Dr. Cook's letter into evidence. That colloquy proceeded as follows:
Dr. Powers: Do you know to what [Dr. Cook] refers in cognitive disorder? We're missing that one altogether.

*382 Parker: It's  he says  his diagnosis, cognitive disorder, not otherwise specified.
Dr. Powers: What did he mean by that, do you think?

Parker: A cognitive disorder not other than  other than dementia.
Dr. Powers: Do you think there's been some damage done to her thinking? I'm just curious more than anything else on that one 
Parker: Yes, sir. I haven't  all of our patients have an MRI, but I haven't seen or read the results of that, so I'm not 
Dr. Power: Thank you.
(Emphasis added).
¶ 34. Then, instead of forming his own opinion, Dr. Powers deferred his opinion to that of Dr. Cook's. Dr. Powers specifically stated, "[w]e have basically deferred to her treating psychiatrist" and "[w]e defer to him." Dr. Powers also said, "If I didn't have this letter, [outpatient treatment] would have been my recommendation."
¶ 35. In Jones v. State, 776 So.2d 643, 650(¶ 22) (Miss.2000), Dr. Steven Hayne, a forensic pathologist, testified that a forensic anthropologist was present during an autopsy and that the forensic anthropologist's comments were "confirmatory" of his findings. Dr. Hayne also testified that the forensic anthropologist's comments were "something that is reasonably and customarily relied upon by forensic pathologists . . . in forming opinions." Id. Jones appealed and claimed the circuit court erred when it admitted Dr. Hayne's hearsay testimony. Id. The supreme court affirmed and held that, pursuant to Mississippi Rule of Evidence 703, the circuit court did not err when it allowed Dr. Hayne's testimony. Id. at (¶ 23).
¶ 36. In Alexander v. State, 759 So.2d 411, 420(¶ 31) (Miss.2000), Dr. Hayne testified and used another expert's autopsy report "in forming his own opinion as to the victim's cause of death." Id. (emphasis added). Alexander appealed and claimed the circuit court erred when it allowed Dr. Hayne to testify using the other expert's autopsy report. Id. The supreme court held that, pursuant to Mississippi Rule of Evidence 703, an expert may "base his opinion on the opinions of others which are not in evidence so long as experts in the field ordinarily rely on such opinions in forming their own opinions." Id. at (¶ 30) (emphasis added). The supreme court also provided the following example, "a psychiatric expert may rely on the reports of a patient's psychiatric history in arriving at his diagnosis." Id. (citing Gray v. State, 728 So.2d 36, 56-57(¶ 86) (Miss. 1998)).
¶ 37. While Rule 703 permits the formation of an opinion by using certain contemplated forms of information, it is not a vehicle for admissibility of otherwise inadmissible evidence. Dr. Powers could have used Dr. Cook's letter as a basis to form his own independent opinion, but he did not do so. He used Dr. Cook's letter, and he had to clarify Dr. Cook's letter with Parker, who was in no way qualified to elaborate on such matters. There was no testimony or other evidence that psychologists ordinarily rely on letters from psychiatrists that are explained and elaborated upon by unqualified social workers. Even if that suggestion was present, it would not have rendered Dr. Cook's letter admissible. Accordingly, we reverse the chancellor's decision and render judgment for Thelma. Based on the resolution of this issue, there is no need to analyze Thelma's remaining issues. We decline to address those issues that are entirely moot. However, we consider certain procedural issues to develop previously unaddressed questions in our state jurisprudence.
*383 IV. WHETHER THE CHANCERY CLERK ERRED WHEN HE ISSUED THE WRIT DIRECTING THE SHERIFF TO TAKE THELMA INTO CUSTODY.
¶ 38. An involuntary commitment proceeding begins with the filing of an affidavit. To conduct an involuntary commitment hearing, a relative or "interested person" must file an affidavit pursuant to section 41-21-65 of the Mississippi Code Annotated (Supp.2007). That affidavit must meet certain statutory criteria. Section 41-21-65 provides:
The affidavit must contain factual descriptions of the proposed patient's recent behavior, including a description of the behavior, where it occurred, and over what period of time it occurred. Each factual allegation must be supported by observations of witnesses named in the affidavit. Affidavits shall be stated in behavioral terms and shall not contain judgmental or conclusory statements.
¶ 39. The chancellor must then determine whether to direct the chancery clerk to issue a writ directing the sheriff to take the proposed patient into custody. The chancellor's decision hinges on whether the affidavit meets the criteria of section 41-21-65. If the affidavit fails to set forth factual allegations and witnesses sufficient to support the need for treatment, the chancellor must refuse to direct the clerk to issue the writ. Miss.Code Ann. § 41-21-67(1) (Rev.2005). However, if the chancellor finds that the affidavit meets the requirements of section 41-21-65, and the chancellor so directs, the chancery clerk shall issue a writ of custody. Miss. Code Ann. § 41-21-67(1) (Rev.2005).
¶ 40. According to Thelma, without a chancellor's direction, a chancery clerk has no authority to issue a writ. The chancery clerk issued the writ to take Thelma into custody on October 13, 2006, and filed it three days later. Thelma claims the writs were defective because the chancellor did not sign either one. Thelma did not raise this issue during her hearing before the special master. We will not consider an issue unless the trial court first had an opportunity to consider it. Martindale v. Wilbanks, 744 So.2d 252, 255(¶ 11) (Miss.1999). However, Thelma submits that we should review this issue for plain error. We may only review an issue for plain error if the error of the trial court impacted one of Thelma's fundamental rights. Pub. Employees' Ret. Sys. v. Dishmon, 797 So.2d 888, 897(¶ 35) (Miss. 2001).
¶ 41. We decline to review this issue for plain error because the point is moot based on our resolution of Thelma's hearsay issue. However, we interpret Thelma's argument to mean that, because the record contains no finding by the chancellor that Marilyn's affidavit sufficiently met the requirements of section 41-21-65, the clerk should not have issued the writ of custody. There appears to be no statutory authority for Thelma's proposition. Be that as it may, we urge chancellors to make such findings and to place them among the record to prevent future confusion.
V. WHETHER THELMA RECEIVED ADEQUATE NOTICE OF THE HEARING.
¶ 42. The record indicates that Thelma received notice of the hearing on the actual date of the hearing. Thelma did not raise this issue during the hearing. However, Thelma suggests that the chancellor committed plain error when he allowed the hearing to take place on the same day she received her notice.
¶ 43. According to the legislative procedure, "If the chancellor or clerk finds, *384 based upon the physicians' and any psychologist's certificate and any other relevant evidence, that the respondent is in need of treatment . . ., the clerk shall immediately set the matter for a hearing. The hearing shall be set within (7) days of the filing of said certificate unless an extension is requested by the respondent's attorney." Miss.Code Ann. § 41-21-71 (Rev.2005). Pursuant to Mississippi Code Annotated section 41-21-73(1) (Rev.2005), "[w]ithin a reasonable period of time before the hearing, notice of same shall be provided the respondent and his attorney . . ." Whether one received reasonable notice depends on the facts of the case. Jenkins v. Jenkins, 757 So.2d 339, 344(¶ 11) (Miss.Ct.App.2000).
¶ 44. Based on our resolution of Thelma's hearsay issue, this issue is moot for all practical purposes. However, we must note that, under similar circumstances preserved by a proper objection, it is entirely possible that Thelma did not receive adequate notice. It is clear that Thelma received notice of the hearing on the day of the hearing. The record does not indicate just when Thelma received notice of the hearing. However, the notice indicates that the hearing began at noon. As Thelma points out, "[a]ssuming the chancery clerk's office opened at 8:00 a.m. ... the maximum notice Thelma would have received would have been four hours."
¶ 45. The North Dakota Supreme Court considered a similar issue in Byzewski v. R.O., 652 N.W.2d 327 (N.D.2002). In Byzewski, R.O. was subjected to a civil commitment proceeding. Id. at 327(¶ 2). At the time of his hearing, R.O. claimed he received insufficient notice of the hearing and moved for a continuance. Id. The trial court overruled R.O.'s request. Id. at 328(¶ 2).
¶ 46. On appeal, R.O. submitted that the trial court erred when it overruled his request for a continuance. The corresponding North Dakota statute required that notice be given sufficiently in advance of an involuntary commitment hearing "to permit preparation for the hearing." Id. at 329(¶ 11) (citing Section 25-03.1-12, N.D.C.C.). The North Dakota Supreme Court reversed the trial court. Id. at 330(¶ 13). In so doing, the Byzewski court noted that R.O. received less than twenty-four hours' notice of the hearing. Id. at 329-30(¶ 12). Further, as with Thelma, R.O. was not provided counsel until just prior to hearing. According to the Byzewski court, "with less than twenty-four hours' notice, R.O.'s attorney would not have had sufficient time to gather the information from her client and find physicians to testify on R.O.'s behalf." Id. At 329(¶ 12).
¶ 47. Though we do not reach the merits of the issue, we must note that the reasoning in Byzewski is persuasive, though we neither adopt nor reject it by this opinion. Suffice it to say that it is entirely possible that a maximum of four hours would not amount to "reasonable notice." Assuming Thelma had four hours notice, during those four hours, she underwent a medical exam, a pre-evaluation, a psychological exam, she was taken into custody, and transported from the Baptist hospital in Jackson, Mississippi to the HCDC in Raymond, Mississippi where she met her attorney for the first time. We urge chancellors to be cautious in providing adequate notice to those who face involuntary commitment.
¶ 48. Though Thelma does not raise this issue, our review of the record reveals one final matter that bears discussion. Mississippi Code Annotated section 41-21-73(4) (Rev.2005) provides:
If the court finds by clear and convincing evidence that the proposed patient is mentally ill. . . . and, if after careful *385 consideration of reasonable alternative dispositions, including, but not limited to, dismissal of the proceedings, the court finds that there is no suitable alternative to judicial commitment, the court shall commit the patient for treatment in the least restrictive treatment facility that can meet the patient's treatment needs. . . . Alternatives to commitment to inpatient care may include, but shall not be limited to: voluntary or court-ordered outpatient commitment for treatment with specific reference to a treatment regimen, day treatment in a hospital, night treatment in a hospital, placement in the custody of a friend or relative or the provision of home health services.
"The court shall state the findings of fact and conclusions of law that constitute the basis for the order of commitment." Miss. Code Ann. § 41-21-73(6) (Rev.2005). "The findings shall include a listing of less restrictive alternatives considered by the court and the reasons that each was found not suitable." Id.
¶ 49. Thelma's commitment order is a form order. That form contains a section that reads, "The following (out-patient care) (alternative living arrangements) (others) (has) (have) been considered as alternative to institutionalization and have been found (not) suitable for the following reasons[.]" The chancellor did not circle or otherwise indicate any of the possible responses. Underneath that section is a blank area of ruled lines. The chancellor only entered "N/A" on those lines. We interpret sections 41-21-73(4) and 41-21-73(6) to require written findings of fact and conclusions of law even when the chancellor finds no reasonable alternatives to commitment. That is, we urge chancellors to detail their reasoning as to why there were no suitable less restrictive alternatives. Though we do not reach the question of whether the absence of such findings result in reversible error, we can safely state that the statutes at issue require such findings. Not only that, such findings aid in appellate review.
¶ 50. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS REVERSED AND JUDGMENT RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION.
CARLTON, J., DISSENTING:
¶ 51. I disagree with the majority's finding that the trial court committed reversible error by admitting Dr. Cook's letter into evidence through Parker. Because Dr. Powers permissibly relied on Dr. Cook's letter pursuant to Mississippi Rule of Evidence 703, I find any error to be harmless. Accordingly, I respectfully dissent.
¶ 52. At the hearing, Dr. Powers offered his expert opinion based on his evaluation of Koestler, as well as the letter of her treating physician, Dr. Cook. Rule 703[3] allows an expert to base his opinion on inadmissible evidence provided that the evidence is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.] . . ." The Mississippi Supreme Court has held that the opinion of a non-testifying *386 expert is a type of evidence normally relied upon by experts in forming their own opinion; thus, it is not inadmissible hearsay when relied on by a testifying expert. Alexander v. State, 759 So.2d 411, 420 (¶¶ 29-31) (Miss.2000) (citing Gray v. State, 728 So.2d 36, 56-57 (¶¶ 79-87) (Miss. 1998)). See also Jones v. State, 776 So.2d 643, 650 (¶¶ 22-23) (Miss.2000) (expert allowed to testify that forensic anthropologist was present at autopsy and made statements that conformed to the expert's opinion). In my view, Dr. Powers permissibly relied on and adopted Dr. Cook's letter in forming his own opinion, and he testified accordingly. As a result, the trial court was exposed to the findings contained in Dr. Cook's letter.
¶ 53. As the majority notes, Dr. Cook's letter was read into evidence by Parker. As Parker did not testify as an expert, I agree that the trial court erred in admitting the letter through her testimony. However, I find any error to be harmless. The substance of the letter was also put before the trial court through Dr. Powers's expert opinion testimony, which rendered Parker's reading of the letter insignificant. Consequently, I would affirm the trial court's judgment to involuntarily commit Koestler.
NOTES
[1] The record contains a "certificate of examining physician/psychologist." By that document, Dr. Powers and Dr. Packer certified that they examined Thelma on October 16, 2006, the date of the hearing. The certificate provides for options as to whether they recommended commitment to a treatment facility, but no response is indicated. Instead, there is a handwritten note by Dr. Powers in which he noted his deference to Dr. Cook's opinion.
[2] This information is not included in the record. The only mention of this ever having occurred is by way of Thelma's brief. However, because Marilyn did not file a brief, Thelma's version of subsequent events is entirely unchallenged.
[3] Rule 703 provides that:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.