# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

# NO. 2021-CA-01071-COA

LYNNE O. CATLETT                                                                                    APPELLANT

v.

ROBERT CATLETT, FIFTH THIRD                                                          APPELLEES
MORTGAGE COMPANY, UNDERWOOD LAW
FIRM PLLC AND WILLIAM ROBERT
COLEMAN, JR.

DATE OF JUDGMENT:              08/20/2021
TRIAL JUDGE:                   HON. TROY FARRELL ODOM
COURT FROM WHICH APPEALED:     RANKIN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        CLARENCE McDONALD LELAND
ATTORNEYS FOR APPELLEES:       ROBERT CATLETT (PRO SE)
                               FREDERICK N. SALVO III
                               SAMUEL D. GREGORY
                               CHARLES FRANK FAIR BARBOUR
                               WILLIAM R. COLEMAN JR.
NATURE OF THE CASE:            CIVIL - REAL PROPERTY
DISPOSITION:                   AFFIRMED - 03/07/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.**

**WESTBROOKS, J., FOR THE COURT**:

¶1.     Lynne Catlett and Robert Catlett are currently in an estranged marriage. The couple separated in August 2010. Sometime later, Lynne filed for divorce due to irreconcilable differences, but the action was dismissed for lack of prosecution. Lynne and Robert have two adult children (one son and one daughter) named Tyler Joseph Catlett and Courtney Catlett. When the children were younger, Lynne and Robert purchased a home located at 1004 Stonehenge Drive, Brandon, Mississippi, 39042, on October 28, 1999. This home is

the catalyst to the current cause of action.

¶2.     When Robert and Lynne purchased the home through Ever Home Mortgage, Robert secured a note for its purchase in the amount of $101,023 to Mid State Mortgage. Lynne's name was not listed on the loan because her credit was in poor condition. However, Lynne's name was on this 1999 deed of trust, which was executed to H. Farris Crislor as trustee for Mid State Mortgage to cover the home and secure the note.

¶3.     Throughout the years, the monthly mortgage was approximately $1,100. This mortgage amount became too high for the Catletts, as indicated by their filing for bankruptcy in 2004. The same year, Lynne also had back surgery and was no longer working. She returned to work sometime in 2006 after she and Robert defaulted on the mortgage loan.

¶4.     On March 24, 2010, Robert refinanced the home. Robert went to William Coleman Jr.'s office in Ridgeland, Mississippi, to execute the new note with a principle balance of $104,497. In the new 2010 deed of trust, Gregory S. Graham was named trustee for Fifth Third Mortgage. Gregory S. Graham was later substituted as trustee for Underwood Law Firm.

¶5.     The 2010 deed contained the initials "RC" and "LC" at the bottom of each page, and a signature for Lynne and Robert on the last page was notarized by William Coleman Jr. with his seal. The acknowledgment stated that the signatories "personally appeared" and named Robert M. Catlett and Lynne O. Catlett. Due to the refinancing, Robert received a little less than $10,000 in cash but the use of that cash is disputed by Lynne and Robert. Additionally, the monthly mortgage was reduced by an estimated $200. Fifth Third paid the original note

2

in full, and the 1999 deed was cancelled.

¶6. In August 2010, Robert moved out of the residential home, while Lynne remained with the two children. Afterward, Robert agreed to continue to pay the mortgage until 2012. Lynne returned to work around that time and became employed with Robert Parker as a certified public accountant (CPA). On March 6, 2012, Lynne's attorney, Judy Barnett wrote to Fifth Third informing the entity that Lynne did not sign the 2010 deed and that someone else forged her signature. No further action was taken.

¶7. In 2013, the Catletts defaulted on the loan. Underwood, on behalf of Fifth Third, sent a letter to the residential address notifying the Catletts of foreclosure if the $5,400 debt was not resolved within a set period of time. In 2013, Lynne sent a check to Fifth Third in the amount of $5,400 and began making monthly payments until January 2015.

¶8. In 2015, the mortgage was in arrears once again. On January 13, 2015, Underwood sent another letter, on behalf of Fifth Third, informing Lynne of $7,642.44 of debt and the impending foreclosure sale should the debt not be paid by February 12, 2015. In March 2015, Underwood mailed another foreclosure notice. On March 17, 2015, Attorney Brent Southern, representing Lynne, filed a "Request for Temporary Restraining Order and Emergency Injunctive Relief" in the County Court of Rankin County.

¶9. On August 18, 2015, Underwood sent letters to Brent and Lynne stating that the debt totaled $16,717.06 and that continued failure to pay would result in foreclosure. Fifth Third then publicized the foreclosure sale in the *Rankin County News* on three separate occasions: September 30, 2015, October 7, 2015, and October 14, 2015. On October 21, 2015, Fifth

3

Third foreclosed on the property and purchased the property through a foreclosure sale.

¶10. On December 3, 2015, Fifth Third sent Lynne a notice to vacate the premises. On December 14, 2015, Fifth Third filed a complaint in the Rankin County County Court for the unlawful entry and detainment of the current residents at 1004 Stonehenge Drive and requested their removal from the premises. In April 2016, Rankin County County Court Judge Kent McDaniel issued a warrant for Lynne's removal. In May 2016, Lynne moved to set aside the removal. In August 2016, a hearing was held on the motion to set aside or alter the judgment. During the August 2016 hearing, the court determined that the basis for Lynne's temporary restraining order (TRO) could not be decided by the court because it lacked jurisdiction to hear issues based on fraudulent conveyances. The court determined that, based on the record, the foreclosure was proper and suggested that Lynne file criminal charges against the culpable parties and file a separate claim for fraud in chancery court. On September 1, 2016, the county court ordered Lynne's removal from the property.

¶11. On November 28, 2016, however, Lynne filed a "Request for Emergency Temporary Restraining Order And Emergency Injunctive Relief With Notice" in the Rankin County Chancery Court. Lynne charged that Fifth Third had committed fraud by closing on a loan at William Robert Coleman Jr.'s place of business entitled Benchmark Title LLC. Lynne further alleged that William failed to obtain identification of the unknown woman Robert brought with him to the closing to sign Lynne's name. Additionally, Lynne asserted that Fifth Third's foreclosure on the home was improper because Fifth Third had accepted monetary payments from her. Lynne requested that the chancery court reverse the county

4

court's order demanding Lynne's removal from the home and set aside Fifth Third's foreclosure sale of the home. Lynne also requested a hearing to determine Fifth Third's participation in the alleged fraud.

¶12. On December 1, 2016, a TRO hearing was held before Judge John S. Grant III. At the hearing, Judge Grant stated that because the chancery court was a court of equity, his ruling was limited to the TRO. All of Lynne's other claims, like fraud, conspiracy, and breach of contract, were alleged torts. Thus, it was necessary for those claims to be heard in a court of law (e.g., the Rankin County Circuit Court). On December 13, 2016, the chancellor denied Lynne's request for a TRO.

¶13. On May 1, 2017, Lynne filed a "Complaint to Set Aside Fraudulent, Unlawful, Wrongful Foreclosure to Void Deeds, to Confirm Plaintiff's Title to Property and for Additional Other Relief" against defendants Robert Catlett, William Coleman Jr., Fifth Third, and Underwood, in order to set aside Fifth Third's foreclosure sale. Lynne claimed wrongful foreclosure, asserting that Fifth Third failed to comply with Mississippi law, breached its contract with Robert, and did not act in good faith by accepting Lynne's monthly payments. On May 4, 2017, Lynne filed a second "Request for Emergency Temporary Restraining Order and Emergency Injunctive Relief with Notice" requesting the same relief as she did before and that the chancellor reverse the order removing Lynne from the home.

¶14. On May 8 and 9, 2017, the chancellor held another TRO hearing. The chancellor denied Lynne's TRO request for being frivolous and then imposed sanctions of $3,000 to be given to opposing counsel. The chancellor also dismissed Lynne's complaint for being filed

outside the statute of limitations. On May 30, 2017, Lynne moved for reconsideration. On June 2, 2017, Lynne moved to stay the order imposing sanctions.

¶15. On June 6, 2017, the chancellor held a hearing on Lynne's motion for reconsideration. The chancellor set aside the dismissal of Lynne's complaint, finding that the court applied the incorrect statute of limitations to Lynne's fraudulent-conveyance claim. On June 19, 2017, the chancellor ruled that Lynne timely filed the complaint within the ten-year period under Mississippi Annotated Code section 15-1-7 (Rev. 2012), granted a new trial, and denied the request to stay sanctions, but reduced the sanction amount to $1,500.

¶16. The chancellor granted Lynne leave to properly serve the May 1, 2017 complaint. In the following months, the defendants timely answered. Robert moved to dismiss the complaint against him due to improper service of process, and Fifth Third moved for summary judgment. The court denied both motions as well as Fifth Third's subsequent motion for reconsideration. Then, Lynne and Robert's depositions were taken.

¶17. On June 30, 2021, a trial was held on the issue of whether the foreclosure of the property was void due to the alleged forgery of Lynne's signature on the 2010 deed. Lynne and Robert both testified at trial. William's, Rod Nixon's, and Parker's testimonies were stipulated to from prior hearings.

### A.    Lynne Catlett's Testimony

¶18. Lynne testified that when she and Robert first purchased the home in 1999, she was present for the home closing and the deed's execution. In December 2001, Lynne testified that her "back collapsed." In 2003, she had back surgery and did not work for three years.

¶19.    Lynne testified that she and Robert filed for bankruptcy in 2004 and entered into a default recovery plan to bring the mortgage out of default. When she became aware in 2006 that she and Robert had again defaulted on their mortgage and had not paid the mortgage for approximately five months, she resolved to return to work.

¶20.    Lynne knew about the refinancing before March 24, 2010. Lynne testified that she had spoken with Robert about the refinancing and told him that as long as the monthly mortgage payment was lowered, it was "fine with [her]." Lynne also testified that she was aware that the refinancing was taking place on March 24, 2010. She spoke with Robert and asked him "did he need [her]." According to Lynne, Robert said, "Oh, I think I've got it handled. . . . If I need you, I'll call you." She testified that since she was working in her office "two blocks up the road," she could have been at the closing office in "two minutes." Coleman's office and Lynne's employer's office were both on Northpark Drive. But Lynne stated that she did not sign the 2010 deed that day because Robert did not call her and tell her that he needed her or her signature. Additionally, Lynne said that she has never given Robert permission to sign her name on her behalf. Fifth Third's attorney then asked about the TRO motion Lynne filed on May 4, 2017. Then, the TRO motion was admitted into evidence.

¶21.    Lynne testified that she was working on March 24, 2010. This was consistent with the exhibits attached to her TRO motion. Lynne had attached a letter from her employer Robert Parker, which stated that during the month of March 2010, he and Lynne took little to no breaks. Enclosed with the letter was a copy of her pay stub from March 18, 2010, through March 31, 2010, showing that Lynne was paid for working 122.45 hours.

7

¶22.    Lynne also testified that Robert moved out of the home on August 8, 2010. She asked Robert how the mortgage would be paid once he moved out. Lynne testified that she told him if he continued to pay the mortgage, then she would consider it to be his monthly child-support payments. Thereafter, Lynne retained Rod Nixon as a divorce attorney in 2011. Lynne petitioned for divorce on August 12, 2011, but that petition was dismissed for lack of prosecution.

¶23.    Lynne stated that in 2012 Robert stopped making mortgage payments. Sometime later, he came to her office and asked her to sign a home equity loan, which she refused. Lynne stated that she refused to sign the home equity loan because Robert did not tell her that he was going to stop making mortgage payments.

¶24.    Lynne testified that her employer, Parker, then prompted her to go to the courthouse and review the deed for the home. When she went to the Rankin County Tax Assessor's Office, she saw that the 2010 deed had her signature on it. Lynne testified that she did not become aware that her signature had been forged until then.

¶25.    Once Lynne returned to work, Lynne testified that she promptly called Fifth Third, with Parker listening, to inform Fifth Third that she had not signed the 2010 deed. She also testified that after her discovery she sent monthly mortgage payments to Fifth Third attaching a letter each time notifying them of the alleged incorrect signature.[1] Fifth Third never responded to these letters. Lynne testified that after she did not receive any communication

---

[1] While Lynne testified she sent letters notifying Fifth Third about the incorrect signature, the letters admitted in the record merely state that the mortgage was in Robert's name and that he let the mortgage fall into foreclosure. The letters do not themselves allude to a forgery.

8

from Fifth Third, she went to an attorney for help. Afterwards, Lynn, through counsel, sent Fifth Third a letter dated March 6, 2012, notifying Fifth Third of the suspected forgery. Fifth Third did not respond to this letter either.

¶26. Lynne testified that in addition to not signing the 2010 deed, she also did not sign any of the other documents in the "closing packet" that referred to the refinancing of the home. Documents with Lynne's signature were submitted into evidence for comparison between signatures that she purportedly signed and the signatures in the closing packet. Lynne testified that she did not obtain a handwriting expert to compare the signatures because she "[n]ever looked for one, but there are non - - there's not one in the state of Mississippi."

¶27. Lynne testified that the signatures in the closing packet were unlike her signature because she always included her middle initial in her signature. Then, one of Fifth Third's attorneys introduced to Lynne her petition for divorce and her amended petition for divorce to her. Lynne testified that the signatures on those two documents were hers. Lynne's petition-for-divorce signature spelled out her middle name "Olmi," while the amended petition only stated "O." Fifth Third then asked if the signatures without her middle name or middle initial on Lynne's complaint filed on November 28, 2016, and Lynne's complaint filed on May 1, 2017, were her signatures. Lynne stated that the signatures on these documents were indeed hers. Other documents were presented to Lynne, and she testified that the signatures on those documents were hers as well. Ultimately, Fifth Third's attorney asked Lynne if she agreed that her "last name" signed on her interrogatory responses "looked way different than the other signatures," and she said, "Absolutely, I do."

9

## B. Robert Catlett's Testimony

¶28. Robert admitted that he made an agreement with his wife that if he gave her the house, she would not pursue making him pay back child support. Robert testified that it was his understanding that he gave the home to Lynne when he signed what he believed to be the quitclaim deed. No quitclaim deed was presented to the court during this trial to corroborate this testimony.

¶29. Robert testified that when he was with William in his office on March 24, 2010, no one else was there. He said that William told him to "sign your name here. Sign hers there." Robert testified that he was there on his thirty-minute lunch break and was given a lot of papers to sign. Robert could not recall all the documents. Robert stated that he put Lynne's initials "L.C." on the 2010 deed and that Lynne was not present at the closing. Robert further testified that all the pages were initialed by him: both "R.C." and "L.C." Robert stated that he also signed her signature "Lynne Catlett" above the printed signature line "Lynne O. Catlett."

¶30. Robert testified that Lynne knew about the refinancing because he was told by the mortgage company that he had to be "on time with [his] house note for 12 months in a row before" he could qualify for refinancing. Robert then testified that he told Lynne about signing her name on the day of closing. Consistently, Robert's deposition indicated that after Lynne alleged that he had another woman sign her name on the deed, Robert told Lynne that he signed her name himself.

¶31. Robert testified on cross-examination, however, that he did not tell Lynne he signed

10

her name prior to the deposition. A few moments later, Robert stated that Lynne did not ask him if he had signed her name because "the attorney made it sound - - man, it's in his defense. He did ask me. He said, 'She's okay with this, right?' And I said, 'Absolutely.'" Robert stated that "we weren't aware that we had to sign, you know, both supposed to be there and all, you know." Robert stated that he could not recall if he told Lynne that he signed her name on the day of closing, stating that this event occurred over eleven years ago.

¶32. The chancellor sought clarity and asked Robert a few clarifying questions. Robert responded and ultimately testified that the closing attorney told him to sign his wife's signature and that the closing attorney did not ask him to call his wife so that she could be present. Robert further testified that the closing attorney was in the room when Robert signed Lynne's name, and the attorney told Robert to sign and initial his and Lynne's names.

### C.   William Coleman's Testimony from Prior Hearing

¶33. William testified that he did not recall the transaction that occurred on March 24, 2010. William stated that he does not keep a record of the documents he notarizes and signs. Additionally, William testified that he did not recall speaking with Lynne's attorney Rod Nixon about the loan closing.

¶34. William testified that in his office, "we verify who comes into loan closings." Further, it was his typical protocol to retrieve an identification from those signing. William testified that he was sure he asked for identification.

### D.   Robert Parker's Testimony from Prior Hearing

¶35. Parker testified that he and Lynne checked the employment time records on March 24,

2010. The records indicated that she was in the office working on the day of the closing. Parker testified that the closing occurred during tax season. Parker stated that because his staff specializes in accounting, during tax season, his staff usually works six and ten hour days. Therefore, on the day Robert signed the 2010 deed, Lynne was likely working.

¶36. Parker further testified that each employee maintains his or her own time records for billing clients. Parker stated that his employees enter the time and then email it to him. Parker also testified that he is the only person who has access to the program that allows a person to review the time records. As a result, Lynne would not have been able to change the time records after the fact.

¶37. Parker then testified that he had seen Lynne's signature over a hundred times, because she had worked with him for at least five years. Parker said that when Lynne showed him the 2010 deed, he saw the signature and "recognized it, but it wasn't the one that I recognized as her records signature." Parker stated that there were some differences between her standard signature at work and the signature on the 2010 deed, but he "could not testify that it was fraud or was a forged signature, and [he] suggested she get an expert."

¶38. On July 7, 2021, the chancellor ruled on the allegation of forgery. The chancellor determined that Lynne did not meet her burden of showing that her signature had been forged on the 2010 deed. Lynne moved for reconsideration and a new trial. On August 20, 2021, the chancery court entered final judgment dismissing the wrongful foreclosure claim based on forgery and all other claims as being barred by the three-year statute of limitations. Lynne appeals from the chancery court's judgment asserting that the chancellor erred because

sufficient evidence showed that the signature on the 2010 deed was a forgery.

## DISCUSSION

¶39. Lynne argues that her signature was forged on the 2010 deed. "The findings of a chancellor will not be disturbed unless this Court finds the chancellor abused his discretion, was manifestly wrong or made a finding which was clearly erroneous." *Matthews v. Whitney Bank*, 282 So. 3d 786, 792 (¶21) (Miss. Ct. App. 2019). "When a party challenges the validity of a properly[] acknowledged deed, that party must overcome several presumptions favoring the legitimacy of the document." *Mapp v. Chambers*, 25 So. 3d 1096, 1101 (¶22) (Miss. Ct. App. 2010). One of the presumptions is authenticity, which "provides that, where a deed is properly acknowledged, the instrument is presumed to be authentic because the certificate of acknowledgment infers verity and presumptively states the truth." *Id*. It is presumed that "the notary making a certificate of acknowledgment has certified to the truth and has not been guilty of a wrongful or criminal action." *Matthews*, 282 So. 3d at 792 (¶22). This presumption is "one of the strongest in the law." *Id*. (quoting *Sapukotana v. Sapukotana*, 179 So. 3d 1105, 1114 (¶26) (Miss. 2015)). It can only be overcome by clear and convincing evidence. *Id*. at 792 (¶22).

¶40. Lynne testified at trial that she was not present when her estranged husband Robert met with notary and closing estate attorney William Coleman Jr. to sign the 2010 deed that secured the home equity loan financed by Fifth Third. On March 24, 2010, Robert met with William and signed the 2010 deed refinancing the home purchased by Robert and Lynne in October 1999. Robert testified at trial that he forged Lynne's signature on the 2010 deed.

13

Contrastingly, however, William testified that although he did not recall the specific transaction that occurred on March 24, 2010, it was his standard practice to identify all signatories before notarizing the document.

¶41. The facts of this case are similar to *Matthews*. In *Matthews*, the husband Michael alleged that his signature was forged on a deed. *Id*. at (¶25). The notary in *Matthews*, like the one in this case, also testified that she did not recall the specific act of notarizing the deed of trust because it had occurred so many years before the date of trial; however, it was her standard practice to notarize documents after the signatory signed in her presence. *Id*. at (¶¶24-25). Based on this evidence, this Court concluded that under Mississippi Rule of Evidence 406, the trier of fact may infer that from an eyewitness's testimony that he or she acted in conformity on a specific occasion with a usual practice or habit. *Id*. at (¶25). Therefore, the chancellor there did not err by finding that the notarial presumption applied, despite that the notary in *Matthews* did not record the act in her notarial registry. *Id*. at (¶26). This Court also held that the failure to follow form "[did] not invalidate an otherwise proper acknowledgment." *Id*.

¶42. For the same reasons, we conclude here that the chancellor did not manifestly err by concluding that the notarial presumption applied. Here, although William did not recall the specific transaction between him and Robert on March 24, 2010, and did not record the act in his notarial registry, William testified that it was his standard protocol to retrieve identification, and he was sure he asked for identification before notarizing the document. William also testified that he verifies "who comes into loan closings." Accordingly, it was

within the chancellor's discretion to infer that William acted in conformity with his standard practice on March 24, 2010, and therefore, reasonably conclude that the notarial presumption applied.

¶43.	Furthermore, "[a] claim of 'fraud has to be clearly alleged, and, on hearing, there is a presumption against fraud, and the facts and circumstances relied upon and alleged must be proved by clear and convincing evidence.'" *Frisby v. Warden*, 269 So. 3d 371, 376 (¶13) (Miss. Ct. App. 2018). Clear and convincing evidence is one of the highest burdens of proof. *O'Neal v. Blalock*, 220 So. 3d 234, 240 (¶13) (Miss. Ct. App. 2017). It is more than showing that a fact is likely, but that it is highly probable. *See Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *J. Pub. Co. v. McCullough*, 743 So. 2d 352, 359-60 (¶23) (Miss. 1999) (stating clear and convincing evidence is not the same as the preponderance of the evidence). Separate from the preponderance-of-the-evidence standard in Mississippi, which is that "the fact to be proved is more probable than not," clear and convincing evidence is evidence that rises to another level but is less than the formidable beyond-a-reasonable-doubt standard. *Gardner v. Wilkinson*, 643 F.2d 1135, 1137 (5th Cir. Unit A Apr. 1981); *O'Neal*, 220 So. 3d at 240 (¶13). Clear and convincing evidence is

> [t]hat weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact-finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*Massey v. Lambert*, 84 So. 3d 846, 848 (¶11) (Miss. Ct. App. 2012); *Koestler v. Koestler*, 976 So. 2d 372, 381 (¶31) (Miss. Ct. App. 2008); *Johnson v. Bay City S. Mortg. Co.*, 928 So.

2d 888, 892 (¶14) (Miss. Ct. App. 2005).

¶44. Additionally, as the trier of fact, the chancellor has the authority to weigh the credibility of witnesses and documents. "The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on [the] credibility of the witnesses and the weight of their testimony." *Ellison v. Meek*, 820 So. 2d 730, 734 (¶11) (Miss. Ct. App. 2002). "The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." *O'Briant v. O'Briant*, 99 So. 3d 802, 806 (¶19) (Miss. Ct. App. 2012). Therefore, and as said so many times before, "[t]he findings of a chancellor will not be disturbed unless this Court finds the chancellor abused his discretion, was manifestly wrong or made a finding which was clearly erroneous." *Matthews*, 282 So. 3d at 792 (¶21).

¶45. Generally, "a party's own testimony is often 'self-serving,' [and] a court does not exclude it as incompetent for that reason alone." *Parkman v. W&T Offshore Inc.*, 544 F. Supp. 3d 642 (M.D. La. 2021). "If all 'self-serving' testimony were excluded from trials, they would be short indeed." *C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) (unpublished). "A court may not disregard evidence merely because it serves the interests of the party introducing it." *Id*.

¶46. However, in other civil arenas similar to fraud claims, such as undue influence, this Court has said that to overcome a presumption by clear and convincing evidence, "something more than the self-serving testimony of the recipient" is required. *In re Est. of Hall*, 32 So. 3d 506, 520 (¶50) (Miss. Ct. App. 2009); *see Wright v. State*, 758 So. 2d 497, 498 (¶3) (Miss.

16

Ct. App. 2000) ("Wright had no evidence to corroborate his version of the events beyond his own self-serving testimony.").

¶47. Reviewing the chancellor's decision in the case at bar, we first consider the following: In *Continental Oil Co. v. Walker*, 238 Miss. 21, 117 So. 2d 333 (1960), our Supreme Court affirmed the lower court decision that there was clear and convincing evidence that the deed was forged when three circumstances existed: "(1) the grantors, who were alive at the time to testify, informed the court that they did not sign the purported instrument; (2) a handwriting expert testified that the signatures on the deed were not the signatures of the grantors; and (3) the grantors established that they were in another state on the purported date the mineral deed was signed." *Mapp*, 25 So. 3d at 1101 (¶24) (citing *Continental Oil*, 238 Miss. at 30, 117 So. 2d at 335-36).

¶48. In *Mapp*, we affirmed the chancellor's ruling that Marilyn presented clear and convincing evidence that she did not sign the deed. *Id.* at 1102 (¶25). First, Marilyn testified that the deed was executed in Forest on the day that she was teaching and employed as a teacher in Jackson, Mississippi. *Id.* The notary testified that she did not know if Marilyn was present to sign the deed. *Id.* The forensic-document-examination expert could not determine to a reasonable degree of certainty that the "signature on the deed belonged to Marilyn." *Id.* at (¶26).

¶49. Relying on the precedent before us, we conclude that the evidence presented in *Continental* and *Mapp* had a higher degree of certainty than the evidence in the case today. In both of those cases, it would not have been possible for the parties to have been in two

places at once. In *Continental*, the grantors were in another state, and in *Mapp*, Marilyn was in another city. *Continental Oil*, 238 Miss. at 30, 117 So. 2d at 335-36; *Mapp*, 25 So. 3d at 1102 (¶25). Whereas here, and based on Lynne's own testimony, she was "two minutes" away from the closing site. In addition, the evidence showed that Lynne worked that day, but the evidence failed to show whether she stayed or left the office. Thus, we find it reasonable for the chancellor to have concluded that Lynne did not rebut the presumption with clear and convincing evidence.

¶50. The chancellor was not convinced by Lynne's testimony that, because she was at work on March 24, 2010, she could not have signed the 2010 deed. The chancellor reasoned that Lynne's place of employment was in such close proximity ("two blocks down") to the location where the 2010 deed was signed, that it was possible for Lynne to have clocked out on her lunch break, signed the document, and returned to work. The chancellor also did not credit much weight to Robert's testimony that he forged Lynne's name, finding Robert's testimony was self-interested and conflicting with prior evidence that a woman was present at the time. Additionally, the chancellor was not convinced that the signature on the deed did not belong to Lynne because he found the signatures presented by Lynne for comparison similar in some respects. Therefore, the chancellor concluded he could not affirmatively state that Lynne's signature had been forged on the 2010 deed.

¶51. We agree and therefore find no abuse of discretion. Although Lynne testified that she did not sign the 2010 deed, and Robert testified that he signed Lynne's name on her behalf, Robert's and Lynne's self-serving testimonies were not sufficient to overcome the notarial

18

presumption by clear and convincing evidence. To be clear, we do not hold that a husband and wife's self-serving testimony can never overcome the notarial presumption and carry the day. We merely hold that the self-serving testimonies in this instance are insufficient because the testimonies conflict, and there is little, if any, corroborating evidence.

¶52. Lynne's and Robert's testimonies leave much to be desired. Although Lynne testified that she did not become aware of her forged signature until after Robert showed up at her office in August 2012, the letter written by her attorney on March 6, 2012, indicates that Lynne knew about the forgery at least three months prior. Furthermore, Lynne testified that she knew Robert was going to William's office on March 24, 2010, because she spoke with him that day about her coming to the closing. And during Robert's testimony, Robert continuously recanted statements he made in his prior deposition and statements he gave on the stand during trial. Robert could not definitively state whether he told Lynne about the closing or whether he told her that he signed her name. And while Robert did testify that William told him to sign Lynne's name, he also stated that he could not remember certain things because it had happened over eleven years ago and because he signed the documents on his thirty-minute lunch break in a rush.

¶53. This husband-and-wife testimonial evidence was not sufficient for two individuals who likely have an interest in having the foreclosure sale voided. *See Matthews*, 282 So. 3d at 795 (¶30) ("[T]he Mississippi Supreme Court 'has long been committed to the doctrine that the testimony of parties in interest is not sufficient to overturn [a notary's public] certificate." (quoting *Bowers v. Fields*, 148 So. 358, 358 (Miss. 1933))); *Mallory v. Walton*,

119 Miss. 396, 81 So. 113, 114 (1919) ("[F]or the presumption is that a certificate of acknowledgment states the truth . . . the evidence here in impeachment of the certificate falls far short, being only the uncorroborated testimony of the grantor whose signature is in question, which evidence is generally held to be in insufficient . . . ." (citations omitted)).

¶54.   Moreover, Lynne's submitted signatures do not establish any key differences between her authenticated signatures and the signature written on the 2010 deed.  Lynne's very own employer, Parker who has seen Lynne's signature at least a hundred times, could not discern her signature from the 2010 deed.  Although obtaining a handwriting expert is not required, when presented with these circumstances, some additional evidence was necessary for Lynne to carry her burden of proof.

¶55.   In sum, Lynne's testimony that she was aware of Robert's intent to refinance the home and William's testimony that he likely checked Robert and Lynne's identifications before notarizing the document more accurately establish that it was more likely than not that the signature was a forgery—but that is not the burden of proof.  The evidence presented by Lynne did not establish a firm conviction of forgery.  Nothing in the record indicates that the chancellor's ruling was unreasonable.  In light of the notarial presumption and the uncertain facts presented, we affirm the chancery court's judgment.

¶56.   **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

20