LEE, C.J.,
for the Court:
¶ 1. Walter Heimert Jr. was granted a divorce from Sheri Heimert on the ground of habitual cruel and inhuman treatment. The chancellor divided the parties’ property, including the equity in the marital home. Sheri now appeals, arguing the chancellor’s findings regarding the divorce and division of property were erroneous.
FACTS AND PROCEDURAL HISTORY
¶ 2. Sheri and Walter were married for approximately five and one half years before Sheri filed for a divorce in the DeSoto County Chancery Court. In her complaint, Sheri requested a divorce based on habitual cruel and inhuman treatment and habitual drunkenness. Walter filed an answer and counter-complaint requesting a divorce based on habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Sheri was fifty-one years old, and Walter was seventy-three years old at the time the couple separated. No children were born of the marriage.
¶ 3. A hearing was held. At the conclusion of Sheri’s case, Walter made a motion to dismiss. The chancellor granted the motion, finding Sheri had failed to provide corroborating evidence to support her claims. Walter then proceeded with his case for a divorce based on habitual cruel and inhuman treatment against Sheri. The chancellor found Walter put on sufficient proof and granted Walter the divorce. The chancellor then divided the marital property. Alimony was denied.
¶4. Sheri now appeals, asserting the following issues: (1) there was insufficient evidence to support a divorce based on habitual cruel and inhuman treatment; (2) the chancellor erroneously admitted a police report into evidence; (3) Walter failed to support his testimony with corroborating evidence; (4) no causal connection existed between Sheri’s behavior and the separation of the parties; (5) the chancellor failed to make specific findings of fact; and (6) the division of the property was not supported by the evidence. Issues one and three will be discussed together, as they are related.
STANDARD OF REVIEW
¶ 5. This Court “will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused [her] discretion, was manifestly wrong ... [or] clearly erroneous[,] or an erroneous legal standard was applied.” Sanderson v. Sanderson, 824 So.2d 623, 625-26 (¶ 8) (Miss.2002) (citation omitted).
¶ 6. The standard of review for a chancellor’s decision to admit or exclude evidence is abuse of discretion. Koestler v. Koestler, 976 So.2d 372, 380 (¶ 26) (Miss.Ct.App.2008). ‘We will find an abuse of discretion if a party shows clear prejudice resulting from an undue constraint on his or her own case or an undue lack of constraint on the opposing party.” Id.
DISCUSSION
I. HABITUAL CRUEL AND INHUMAN TREATMENT
¶ 7. Sheri first argues Walter failed to prove habitual cruel and inhuman treatment by a preponderance of the evidence.
*184 ¶ 8. Habitual cruel and inhuman treatment is conduct that either: (1) “endangers life, limb, or health, or creates a reasonable apprehension of such danger and renders the relationship unsafe for the party seeking relief,” or (2) is so “unnatural and infamous” as to render the marriage revolting to the non-offending spouse, making “it impossible to carry out the duties of the marriage, therefore destroying the basis for its continuance.” Mitchell v. Mitchell, 767 So.2d 1037, 1041 (¶ 14) (Miss.Ct.App.2000) (citing Daigle v. Daigle, 626 So.2d 140, 144 (Miss.1993)). In making a determination, the chancellor must look to “1) the conduct of the offending spouse and 2) the impact of that conduct upon the plaintiff.” Fisher v. Fisher, 771 So.2d 364, 367 (¶ 10) (Miss.2000).
¶ 9. Walter complained Sheri cut his arm with a knife, bit his arm, threatened him with a fork, threw a glass of ice water on him while he watched television, and damaged his truck door out of anger. Walter would often leave the home when an argument arose. On several occasions, Sheri stood behind his truck or climbed into the bed of the truck so that he could not leave. Once, she reported to the police that Walter was threatening to commit suicide, and Walter was taken to the hospital by a SWAT team member. Walter denies he threatened to take his own life. On two occasions, Sheri withdrew the majority of the couple’s money from their joint bank account without Walter’s knowledge or consent. She placed the funds in an individually titled account on one occasion. She returned the funds to the joint account a few days later. Walter testified Sheri’s actions had taken a toll on him physically and emotionally, and he had been prescribed sleeping pills and antidepressants.
¶ 10. The chancellor noted little corroborating evidence existed because the couple did not have many visitors and mainly lived in isolation. However, Sheri’s own testimony provided corroboration. Sheri admitted to biting Walter, removing money from the joint account without Walter’s knowledge, pouring cold water on him, blocking his truck so he could not leave the home, and damaging his truck door. Sheri submitted a handwritten note stating she had attempted to take the tag off Walter’s truck on one occasion when a “Mexican officer” was at their house. She was ordered by the police officer to put the tag back on the truck. No explanation was given as to her actions. Also, two police reports were admitted into evidence.
¶ 11. The first police report states that on August 21, 2007, the Olive Branch Police Department responded to a verbal disturbance at the Heimerts’ home. Both parties were acting disorderly and in an aggressive manner. Sheri had a bruise on her wrist and a scrape on her foot. Walter had a large bite mark on his arm. Both parties were arrested for domestic violence. The police report noted this was the third time in the past year that officers had responded to disturbances at the Hei-merts’ residence. The second report states that on December 5, 2008, Sheri went to a neighbor’s house after an altercation with Walter. She entered the neighbor’s house carrying two dogs, a purse, and an electrical cord. When the police arrived, she was lying on the floor complaining of extreme back pain. Sheri told the police officer that Walter had strangled her with an electrical cord until she passed out. She told police Walter had left the scene in a Ford Mustang. The officer saw no marks on Sheri’s face or neck. The officer found Walter driving nearby in the Mustang and initiated a traffic stop. A detective arrived on the scene to interview Walter. Walter told the detective he was cooking dinner when Sheri attacked him with a sharp object and cut his arm. Walter stated he left the *185 house to avoid being attacked further. The detective determined that Walter was the actual victim, and a warrant was issued for Sheri’s arrest for domestic violence.
¶ 12. We cannot find the chancellor abused her discretion in determining Walter proved his case for habitual cruel and inhuman treatment. The chancellor was able to hear the testimony and determine the credibility and weight to give to each party’s testimony. The chancellor acknowledged the testimony was conflicting, but the chancellor chose to give Walter’s testimony more weight, as she did not find Sheri to be a credible witness. After hearing the testimony and reviewing the evidence, the chancellor made the following conclusion: “[Sheri] has been, it seems, trying to provoke [Walter] to do something so that she can establish grounds for divorce.” Sheri’s conduct in cutting Walter’s arm clearly shows Sheri endangered Walter’s “life, limb, or health” or at least created “a reasonable apprehension of such danger and rendered] the relationship unsafe.” Mitchell, 767 So.2d at 1041 (¶ 14).
¶ 13. While Walter was not blameless in the demise of the marriage, the testimony from both parties showed that when a fight arose, Sheri antagonized Walter, while Walter would at least attempt to avoid the confrontation. Also, Walter was in his mid-seventies, and he testified he was suffering from health problems and had become depressed as a result of Sheri’s behavior. We find the divorce was supported by the facts presented, and the chancellor’s decision was not manifestly wrong or clearly erroneous. This issue is without merit.
II. ADMISSIBILITY OF POLICE REPORT
¶ 14. During the divorce hearing, Sheri was asked to identify police reports from August 2007 and December 2008 detailing altercations between her and Walter. Both documents were identified and admitted into evidence. Sheri now argues the chancellor erred in admitting the December 2008 police report, which shows that Sheri was charged with domestic violence.[1]
¶ 15. In her brief, Sheri argues an objection was made at the hearing on the grounds that the December 2008 report was not properly authenticated and a proper foundation had not been laid for its admission. The following exchange occurred during cross-examination after Sheri was asked to review the December 2008 police report:
[Walter’s attorney:] You’ve had an opportunity to review it, is that a fair and accurate copy?
[Sheri:] Uh, there’s a, uh, discrepancy in here, uh.
[Walter’s attorney:] I’m not asking about any discrepancies, I’m asking you if this is a true and accurate copy?
[Sheri:] Oh.
[Walter’s attorney:] You will be allowed to obviously to explain your discrepancy—
[Sheri:] I, I would, I would, I would assume so, yes.
[Walter’s attorney:] Your Honor, I’d ask that that be marked as an Exhibit and admitted into evidence.
[Sheri’s attorney:] Is that an assumption, or is she certain of the facts? Uh, she’s assumed something.
*186 [Walter’s attorney:] She did assume it, your Honor, and it was provided to me by her in discovery, so.
[Sheri’s attorney:] [If][t]hat’s something that she can identify, then obviously, it’s admissible, but I don’t know if she can identify it or not.
THE COURT: Is that the police report that you provided in discovery? ... I’m not asking you if what the police wrote down is true and correct. I’m asking you is that the report that you provided to [Walter’s attorney] in discovery?
[Sheri:] If [Walter’s attorney] said I did, then I did.
[Sheri’s attorney:] Your Honor, I, I’m, I don’t know if that lays the proper foundation, your Honor.
[[Image here]]
THE COURT: Is that the police report ... [o]f the incident of December the 5th, 2008 between you and [Walter]?
[Sheri:] Yes.
The document was then admitted into evidence.
¶ 16. “Even though police reports, if offered in evidence to prove the truth of the matter asserted[,] are hearsay and the information within them may be based on hearsay, they may be admissible under the hearsay exception in [Mississippi] Rule [of Evidence] 803(8).” Rebelwood Apartments RP, LP v. English, 48 So.3d 483, 491 (¶ 36) (Miss.2010). Rule 803(8), entitled “Public Records and Reports,” states:
Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the state in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.
¶ 17. The police report was taken after an investigation of domestic violence reported by Sheri. No assertion has been made that the document lacks trustworthiness. Sheri argues the police report was inadmissible because it was not authenticated. However, a document may be authenticated by the testimony of a witness with knowledge “that a matter is what it is claimed to be.” M.R.E. 901(b)(1). Sheri was a knowledgeable witness, and she submitted the police report as part of discovery. Sheri testified she was familiar with the document; thus, Sheri’s testimony was sufficient to show that the document was “what it [was] claimed to be” — the police report from December 5, 2008. See Cassibry v. Schlautman, 816 So.2d 398, 403-04 (¶¶ 20-23) (Miss.Ct.App.2001) (finding medical records submitted by plaintiff in discovery were authenticated by plaintiffs own testimony).
¶ 18. Further, Sheri testified consistently with the information in the police report, and Walter testified consistently with his version of events in the police report. Thus, even if the police report was admitted into evidence erroneously, the admission was harmless, as it was cumulative. Id. at 404 (¶ 24)(holding admission of hearsay may be held harmless where corroborating evidence exists). Sheri complains she was prejudiced by the report because it only contained information provided by Walter. However, this is not the case. The report clearly contains information gathered from both Walter and Sheri.
¶ 19. Sheri was familiar with the police report, and she submitted it as part of discovery. Further, the contents of the police report were corroborated by the testimony. We find the police report was properly admitted into evidence. This issue is without merit.
*187 III. CAUSAL CONNECTION
¶ 20. Sheri argues Walter failed to demonstrate a causal connection between her actions and the separation of the parties. Rather, she asserts, it was she who fled the marital residence on December 5, 2008, after Walter attempted to rape and strangle her.
¶ 21. In Fournet v. Fournet, 481 So.2d 326, 329 (Miss.1985), the Mississippi Supreme Court stated: “There is a necessity for [a] causal relationship [between the cruel treatment and separation] to be proved when relying on the ground of habitual cruel and inhuman treatment, and it must be related in point of time to the separation.” However, later cases have held this is not to be interpreted as a strict requirement that a specific act cause the separation. Peters v. Peters, 906 So.2d 64, 70 (¶ 24) (Miss.Ct.App.2004) (citations omitted). Instead, the claimant must show “habitual or continuous behavior over a period of time, close in proximity to the separation, or continuing after a separation occurs” in order to prove habitual cruel and inhuman treatment. Id. (quoting Richard v. Richard, 711 So.2d 884, 890 (¶ 23) (Miss.1998)).
¶ 22. The chancellor examined Sheri’s behavior over a period of time close in proximity to the separation and found it justified a divorce based on habitual cruel and inhuman treatment. We find no authority for Sheri’s assertion that Walter cannot prove habitual cruel and inhuman treatment because it was she, rather than Walter, who left the home on the day the separation started. This issue is without merit.
IV. FERGUSON FACTORS
¶ 23. Sheri next argues the chancellor’s failure to make specific findings of fact regarding the division of property pursuant to Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994), is reversible error. Sheri is correct that the chancellor only generally discussed the Ferguson factors rather than articulating an analysis of each factor. The chancellor even made the following admission:
And again, ... I started a while ago to tell you about the Ferguson factors. I am not going to read into the record each one of the Ferguson factors and analyze each — and tell you my analysis of each one. I guess if it gets appealed, the appellate court’s probably going to come back and tell me that I have to give my analysis, but I’m going to give you a general analysis....
¶ 24. Sheri cites to Lowrey v. Lowrey, 25 So.3d 274, 280 (¶ 7) (Miss.2009), in which the supreme court held as follows:
Factor tests, such as provided in Ferguson for property division and Armstrong [v. Armstrong, 618 So.2d 1278 (Miss.1993) ] for alimony, must be considered on the record in every case.... These factor considerations are not only essential for appellate purposes, but also for trial courts, as they provide a checklist to assist in the accuracy of their rulings. Following these guidelines reduces unintended errors that may affect the court’s ultimate decision. The absence of an analysis of these factors and failure to apply the law to the facts at hand create error.
We once again remind chancellors of the importance of making on-the-record findings for factor tests such as Ferguson. The policy for this rule is clearly set out in Lowrey.
¶ 25. The chancellor erred when she failed to enunciate her analysis of the Ferguson factors as required by Lowrey. Therefore, we reverse the chancellor’s judgment on this issue and remand this case to the DeSoto County Chancery *188 Court for the chancellor to articulate her Ferguson analysis on the record.
V. DIVISION OF INTEREST IN MARITAL RESIDENCE
¶ 26. After considering each party’s contribution to the purchase of the marital home, the chancellor awarded Sheri 33% of the home’s value. Walter was awarded the home and ordered to pay Sheri her portion. Sheri argues the chancellor used erroneous figures in reaching this decision.
¶ 27. Conflicting values were given at trial regarding the marital home. Sheri initially testified she contributed $110,000 toward the home. But during cross-examination, she testified she contributed $100,000. Sheri now argues the chancellor should have used the higher figure. This was an issue within the chancellor’s discretion, and we cannot find the chancellor abused her discretion in using the lower figure.
¶ 28. Sheri also contends the chancellor erred by reducing her $100,000 contribution by $16,000. Walter testified, and Sheri agreed, that Walter repaid her $16,000 of the purchase price of the home. However, Sheri argues this was not an actual repayment because the money was withdrawn from a joint account. The chancellor took this into consideration but found the money could be traced and came from Walter’s separate funds. Again, the chancellor was presented with conflicting evidence. We cannot find the chancellor abused her discretion in judging the credibility of the parties and their testimony. This issue is without merit.
¶ 29. THE JUDGMENT OF THE DE-SOTO COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. ALL COSTS OF THIS APPEAL ARE TO BE DIVIDED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.
IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.

. We note that Sheri does not object to the admission of the August 2007 report, although it was admitted into evidence in the same manner as the December 2008 report. We presume this is because the August 2007 report is not as unfavorable to her case.