# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01302-COA

**DARRYL RANDALL STASHER SR.**                                              **APPELLANT**

**v.**

**SHIRLEY A. STASHER**                                                       **APPELLEE**

DATE OF JUDGMENT:                10/21/2024
TRIAL JUDGE:                     HON. CYNTHIA L. BREWER
COURT FROM WHICH APPEALED:       MADISON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          RICK D. PATT
ATTORNEYS FOR APPELLEE:          E. CHARLENE STIMLEY PRIESTER
                                 MELVIN VINCENT PRIESTER JR.
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED - 04/14/2026
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., LAWRENCE AND EMFINGER, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Shirley and Darryl Stasher were married for approximately thirty years before separating.  Shirley filed a petition for divorce in the Madison County Chancery Court, alleging adultery and habitual cruel and inhuman treatment.  The chancellor granted Shirley's petition on the ground of habitual cruel and inhuman treatment and conducted an equitable distribution of the couple's marital property.  Aggrieved by the chancellor's decision, Darryl appeals.  Finding no error, we affirm.

## FACTUAL BACKGROUND

¶2.     Shirley and Darryl married on August 12, 1989, in Jackson, Mississippi.  For the duration of their marriage, the couple had two children, both of whom were adults at the time

of these proceedings. The couple separated on September 4, 2021,[1] when Shirley left the marital home alleging she was "in fear [for] her safety."

¶3.     On September 14, 2021, Shirley filed a petition for divorce in the Madison County Chancery Court. Her petition alleged habitual cruel and inhuman treatment and adultery or, in the alternative, irreconcilable differences. She also requested alimony and temporary restraining orders. The chancellor granted a motion for continuance filed by Darryl on October 1, 2021. A hearing regarding Shirley's motion for temporary relief was conducted on November 9, 2021, and a temporary order was entered the same day. Of note, the temporary order kept both parties "from disposing of any marital asset without court approval" and ordered that an appraisal be conducted as to the couple's real property. Darryl filed his answer to Shirley's complaint on November 19, 2021.

¶4.     On December 10, 2021, Shirley filed a motion to appoint appraisers for the marital property as directed in the chancellor's temporary order. The chancellor granted her motion on December 14, 2021. On January 5, 2022, Shirley filed a motion for contempt that alleged Darryl had not complied with instructions to have the property appraised and had, in fact, prevented appraisals from being conducted. Approximately one month later, she filed a motion to compel Darryl to answer discovery.

¶5.     On November 29, 2022, the chancellor conducted a hearing, first acknowledging, "The parties have been unsuccessful in determining whether they are in agreement to the end of the marriage." Shirley testified first:

---

[1] The date of separation is denoted as both September 4 and September 7, but Shirley testified that she left on September 4.

2

> The first year of my marriage a child was conceived during our marriage. Darryl came to me crying saying that a woman was taking him to court for child support, and so he said the child was not his because the lady told him that she could not get pregnant.
>
> He told me that he was being, you know, taken to court for child support for a child, and he said the child was not his. So paternity was done, and it was determined that it was his child.

When asked why she stayed with Darryl after this, Shirley explained that they were "in a wedge" and that she "was trying to hold this marriage together." For twenty-one years, Darryl "pa[id] [$]175 a month" in child support to this woman.

¶6. Shirley then stated that on a Sunday morning in or around 1994, Darryl told her he was "going to U-Haul." She "didn't believe him" based on "what had happened before."

> So I got dressed, went to U-Haul. When I got there he was not there. I looked across the street, and as I was leaving I saw his car parked in front of a hotel. . . . I identified what room he was in. I went up to the room, knocked on the door. He came to the window [naked], opened - - looked right in my face and then closed the curtain. I continued to knock on the door. He did not answer anymore. I went downstairs. I sat in my car. I saw him peeping out of the window, but he never came out.

On the topic of adultery, Shirley also stated:

> Throughout the marriage he was always on the phone talking to females. . . . I would walk in, he's having conversations, "What are you wearing?" I caught him sneaking back into the house at night. One night he went out and he wrecked my car.

¶7. In addition, Shirley testified that in August 2016:

> When he was working for [Jackson Police Department, or,] JPD he came home one evening. He came home early, so I knew something was wrong. He started telling my daughter and I about, [']There is a video out there, but it's not true. . . .['] He found the video somehow, and he showed it to my daughter. Then my daughter shared it with me. He was soliciting sex from a 17-year-old. . . . He said [']This is not true. It's not me. They're setting me up.['] But it was

3

clearly his voice.

Darryl's employment was subsequently terminated with JPD.

¶8.     Shirley testified that in August 2021:

[A]s I came in to set up my computer to start working he approached me, and he said that, The check writing account with Ameriprise, I have closed that account. He was walking away. He started calling me all kind of Bs out of my name as he was walking away. At that time, I asked him, Why don't you just leave? We don't want you here. He said, This is my MFing house. You can leave. He said, If you keep talking to me, I will end your life. He came over. I was setting up to do my work. He knocked all of my supplies off of the table, my glasses, my pens, my folders. . . . I feared for my life. He told me, I will end your life.

Shirley stated that after this, she began having panic attacks.

¶9.     Shirley stated that the following incident occurred soon after the previous incident.

He knocked on the door upstairs, talked to [her] friends. He came down and asked me who were those people upstairs. I told him those were friends of Jasmine's. They couldn't check into their hotel room. They were scheduled to go to a wedding and they came here to get dressed. . . . [Darryl] went upstairs, took a shower, put his gun around his waist, came downstairs, and as they were leaving he motioned me to our bedroom. He said, I don't want anybody in this MFing house. He said When Jasmine gets married she cannot live here, and on Monday I am changing all the locks, all the codes, and she just won't be allowed to be here. . . . At that point, he was in my face. I was scared. I didn't say anything. I feared for my life. And when he left the room and her friends left, I went and I started packing. I packed a bag. I waited for him to leave. He put the gun on around 1:00. He did not leave the house until 5:00. I went in. I packed a bag. When he left, I told Jasmine and DJ, it is not safe here. We've got to leave.

Shirley explained that Darryl did not typically walk around the house with his gun on him and that this was his first time doing so.

¶10.    Due to an emergency weather alert, the chancellor ended the hearing in the middle of Shirley's cross-examination and continued the hearing.  The chancellor verbally ordered

4

"both parties to participate in meaningful settlement negotiations" and ordered "the attorneys to pick a mediator to be paid from marital funds[.]"

¶11.    On March 17, 2023, the parties reconvened after being "unable to mediate the matter[.]"  The proceedings resumed in the middle of Shirley's cross-examination.   Shirley testified that Darryl "never denied anything" but "never mentioned a daughter" to Shirley. She also stated that Darryl had another child out of wedlock.  Shirley and Darryl stopped having sexual relations "after the video came out" in which "he was soliciting sex from a 17-year-old."  She additionally noted that "Darryl was always angry about anything."

¶12.    Jasmine Jackson, the couple's adult daughter, was then called to testify.  She recounted the events of the August 2021 incident, stating that she and Shirley had been at home that day.  Jasmine was "upstairs" and "heard a lot of commotion coming from downstairs." She left her room and was able to "see down and hear everything," and she heard Darryl call Shirley "a bitch and all of - - and out of her name over and over again." She also heard Darryl state he would "burn this . . . house down."  Jasmine went downstairs and found her mother's work material "scattered everywhere and she was picking up things and [Darryl] was, like, walking back and forth[.]"  Jasmine took Shirley "to her room and we locked the door, and we . . . stayed in there until [Darryl] left."  Jasmine stated that her mother

> was upset. She was crying. She was shaking. Like, she was trying - - even when she was trying to pick her papers and all that up and get it together, it was just like a glaze like she wasn't there. . . . She wasn't even together. My mom isn't a person that loses her cool like that.

Jasmine also testified that Darryl was "in passing just . . . very critical of [Shirley], even like,

the way you dress sometimes." She had also "heard him tell [Shirley] stop bitching."

¶13. In 2016, JPD released a video of Darryl and a minor "in the car giving her his number and saying he could take care of her and go back to a room or whatever." Jasmine "saw him watching the video and so - - because I saw the screen, I could pull it up on my phone, and I looked it up for myself and I showed it to my mom and she asked him about it and he was just, like, [']That is not me. You're supposed to believe me over everybody. These are lies. I can't believe you don't believe me[.']" After the JPD incident, "[f]rom then it was just - - it was just worse after then. It was more hostile. The name calling, the - - basically, like, you don't question anything I do. And he had always kind of been like that, but it was just - - it was worse after that."

¶14. In September 2021, Jasmine was with friends at her family's home. Her friends went upstairs and "were up there a little while" before coming back downstairs. Downstairs, Jasmine "could see that he was in [Shirley's] face." Jasmine said, "I had never seen him, like point his fingers in her face, like, very close. He had put his belt on, and that belt had a gun on it and he was, like, yelling at her." Jasmine recounted that she

> hurried [her] friends out the door and I kind of just, like - - by the time they were able to get out, they had separated, and next thing I know my mom was, like, you need to get a bag, like, We're about to go. So I packed a bag, my brother p[a]cked a bag, and we left that day and we just didn't come back.

¶15. Linda Allen Thigpen, Shirley's sister, also testified. Shirley began living with her sister in September 2021 and was "very distraught" after leaving the marital home. Linda also stated that she had witnessed Darryl becoming "upset" and "yell and . . . scream" over board games in the past.

6

¶16. Finally, Darryl was called to testify as an adverse witness. Darryl acknowledged that he had a child out of wedlock but stated that he did not use marital funds to pay child support for the child. Instead, the funds for child support "came from friends and family that allowed me to manage their money that I did things for and they did things for me to keep it out of my wife's face of that, you know, mistake that I made." Darryl alleged that these funds from family and friends were not gifts but also that he did not do any "work for any friends and family." When asked to explain this, Darryl stated that he "did things for people and they let me manage their money," which involved "writing checks and keeping things from wherever they wanted them to be at." This was essentially the extent of Darryl's answers on the topic. Additionally, Darryl contested the video from JPD and claimed it was not him. He also stated that the attorney he hired in that action was not paid from marital funds but, again, "[f]riends and family." Shirley presented exhibits detailing deposits and withdrawals from multiple accounts. Many of Darryl's statements explaining funds were contradictory to one another and, as before, ultimately unclear as to where certain monies had come from.

¶17. Darryl testified that Shirley had actually left the house after he closed a joint investment account because Shirley "was stealing money from it." He stated:

> That is why she got mad. That is why she left the house. I never threatened her. I'm emotional, so, you know, wouldn't sound happy, I'm sure, when I told her that, yeah. I asked her where the money went.

Continuing, Darryl called Shirley's claim that he threatened to end her life a

> [t]otal fabrication. Never have I ever, ever, threatened or been aggressive towards my wife, not one day. She tried to bait me into a couple of things before, I mean, on several occasions. I stayed cool, slept on the couch. Never ever have I threatened her. I have the capabilities of, you know, doing

7

whatever I want to do as far as physically, but I have never ever.

Darryl also testified that he would "wear a gun every day" and that Jasmine had previously "physically attacked him[.]"

¶18.    At the close of Shirley's case, Darryl moved for a dismissal.  The chancellor denied the motion. Darryl's first witness was himself.  He stated that he was still married to Shirley, "want[ed] her to come back home and go to counseling[,]" and did not want a divorce. Additionally, Darryl asserted that he never committed adultery during his marriage after fathering a child outside the marriage.  He also explained his current job responsibilities of carrying a gun to and from his home.  Particularly of note, Darryl never submitted a Rule 8.05 financial statement to the chancery court.  UCCR 8.05.

¶19.    On January 3, 2024, the chancellor entered an opinion granting Shirley a divorce:

> The [c]ourt heard clear and convincing evidence at trial to establish Darryl is guilty of both uncondoned adultery and habitual cruel and inhuman treatment. The [c]ourt must determine the cause of the deterioration of the marital relationship.  In addition to the testimony and evidence presented, the [c]ourt considers . . . [that Shirley] asserts she "left the marital home in fear for her safety." While Shirley met the burden of proving uncondoned adultery, the [c]ourt finds Darryl's habitual cruel and inhuman treatment caused the ultimate deterioration of the marital relationship.  The [c]ourt . . . grants **a full, final, and absolute divorce to Shirley on the grounds of habitual cruel and inhuman treatment**[.]

(Emphasis added).  Following an analysis of the *Ferguson* factors,[2] the chancellor held that the parties' assets would be split 60/40, with 60% being allocated to Shirley and 40% being allocated to Darryl.  The chancellor also reserved ruling on Darryl's military accounts until more evidence was brought before the court.

---

[2] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

¶20. On March 13, 2024, the chancellor held a hearing with both parties to discuss the additional evidence covering Darryl's military retirement accounts. Darryl was called adversely to testify further on details of those accounts. On June 24, 2024, the chancellor entered an order requiring both Shirley and Darryl to submit their proposed findings of fact to the court. Both parties submitted those approximately one month later. On October 21, 2024, the chancellor's final judgment of divorce was entered, along with a supplemental opinion. The final judgment indicated that the military retirement accounts were 79% marital property and that this amount would be split evenly between Shirley and Darryl. The final judgment also granted Shirley's previous motion for contempt and ordered Darryl to reimburse her for the associated legal fees. On November 19, 2024, Darryl appealed.

## STANDARD OF REVIEW

¶21. "In domestic-relations cases, our standard of review is limited." *Dogan v. Dogan*, 98 So. 3d 1115, 1122 (¶11) (Miss. Ct. App. 2012) (citing *In re Dissolution of Marriage of Wood*, 35 So. 3d 507, 512 (¶8) (Miss. 2010)). "We review a chancellor's decree of divorce for manifest or clear error as to law or fact." *Peters v. Peters*, 906 So. 2d 64, 68 (¶12) (Miss. Ct. App. 2004) (citing *Southerland v. Southerland*, 875 So. 2d 204, 206 (¶5) (Miss. 2004)).[3] "This Court views the facts of a divorce decree in a **light most favorable to the appellee**, and may not disturb the chancery decision unless this Court finds it manifestly wrong or unsupported by substantial evidence." *Id.* (emphasis added) (quoting *Rawson v. Buta*, 609

---

[3] *See also Fisher v. Fisher*, 771 So. 2d 364, 367 (¶8) (Miss. 2000); *Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 880 (¶13) (Miss. 1999); *Chamblee v. Chamblee*, 637 So. 2d 850, 859 (Miss. 1994).

So. 2d 426, 429 (Miss. 1992)).

## ANALYSIS

¶22.   On appeal, Darryl raises three issues: (1) whether the chancellor erred by granting Shirley a divorce on the ground of habitual cruel and inhuman treatment; (2) whether the chancellor erred by finding Darryl engaged in uncondoned adultery; and (3) whether the chancellor's equitable distribution was erroneous.

### I.     Habitual Cruel and Inhuman Treatment

¶23.   Shirley was granted a fault-based divorce on the ground of habitual cruel and inhuman treatment. "Habitual cruel and inhuman treatment is conduct that either: **(1) endangers life, limb, or health, or creates a reasonable apprehension of such danger** and renders the relationship unsafe for the party seeking relief, or (2) is **so unnatural and infamous** as to render the marriage revolting to the non-offending spouse, making it impossible to carry out the duties of the marriage, therefore destroying the basis for its continuance." *Heimert v. Heimert*, 101 So. 3d 181, 184 (¶8) (Miss. Ct. App. 2012) (emphasis added) (quoting *Mitchell v. Mitchell*, 767 So. 2d 1037, 1041 (¶14) (Miss. Ct. App. 2000)).

¶24.   In making a determination, the chancellor must look to "1) the **conduct of the offending spouse** and 2) the **impact of that conduct upon the plaintiff**." *Id.* (emphasis added) (quoting *Fisher*, 771 So. 2d at 367 (¶10) (Miss. 2000)). Shirley provided testimony detailing both Darryl's conduct and the impact it had on her. She stated that he was "always angry about anything." Darryl had threatened to "end [her] life" and gotten in her face. He had become angry when Jasmine's friends came over and yelled at and threatened Shirley.

10

In the same instance, Darryl had put his gun on his hip and walked around the house to further his threat. Jasmine also testified that Darryl had always been "very critical" of her mother. She had heard him once threatening Shirley that he would "burn" the "house down." Shirley adamantly stated that she was in fear for her life. It was this fear that spurred her to move out of the house and separate from Darryl.

¶25.    Darryl also claims Shirley did not sufficiently prove that she endured any kind of physical, verbal, or emotional abuse at his hands. However, "[a]s the finder of fact, the chancellor is vested with the responsibility to hear the evidence, assess the credibility of witnesses, and determine ultimately what weight and worth to afford any particular aspect of the proof." *White v. Miss. Dep't of Hum. Servs.*, 39 So. 3d 986, 990 (¶23) (Miss. Ct. App. 2010) (quoting *Tritle v. Tritle*, 956 So. 2d 369, 373 (¶8) (Miss. Ct. App. 2007)). In other words, "[w]hen it comes to finding facts, **we defer to the chancellor in that we will not substitute our judgment for the chancellor's**." *Id.* Further, "[s]pousal domestic abuse may be established through the reliable testimony of a **single credible witness**, who **may be the injured party**[.]" Miss. Code Ann. § 93-5-1 (Rev. 2021) (emphasis added). Again, Shirley provided testimony detailing the instances of abuse she experienced with Darryl. Additionally, the couple's adult daughter testified and corroborated Shirley's account of events. The chancellor found their testimony credible and, thus, adequate proof to support Shirley's claims. We find substantial evidence in the record to support the chancellor's findings and, accordingly, find this issue to be without merit.

## II.    Adultery

11

¶26. Next, Darryl asserts that Shirley did not adequately prove her allegations of adultery against him. We note that Shirley was **not** granted a divorce on adultery grounds. Darryl asserts, however, that we "should reverse and render, or alternatively remand" the chancellor's decision that Shirley "would be entitled to a divorce on the ground of adultery (assuming that the granting of the fault ground of habitual cruel and inhuman treatment is also reversed, leaving no fault ground of divorce standing)." Because we affirm the chancellor's judgment of divorce based on habitual cruel and inhuman treatment, this issue is moot on appeal. *See 1st Step Sober Living LLC v. Cleveland*, 413 So. 3d 602, 607 (¶15) (Miss. Ct. App. 2025), *cert. denied*, 420 So. 3d 923 (Miss. 2025) (stating that appellate courts typically "dismiss an appeal when **no useful purpose could be accomplished by entertaining it**, when so far as concerns any practical ends to be served the decision upon the legal questions involved would be merely academic" (quoting *In re City of Biloxi*, 113 So. 3d 565, 572 (¶21) (Miss. 2013))). Because we affirm the grant of divorce on the fault-based ground of habitual cruel and inhuman treatment, we find this issue moot and decline to address it.

### III. Equitable Distribution

¶27. Finally, Darryl claims that the chancellor's equitable distribution was an abuse of discretion and should be reversed. In order to equitably distribute marital property, the chancellor must first "classify each asset as marital or non-marital." *Dean v. Dean*, 304 So. 3d 156, 168 (¶47) (Miss. Ct. App. 2020) (quoting *Larue v. Larue*, 969 So. 2d 99, 104 (¶11) (Miss. Ct. App. 2007)). "Marital property has been defined as any and all property acquired

or accumulated during the marriage." *Faerber v. Faerber*, 150 So. 3d 1000, 1005 (¶12) (Miss. Ct. App. 2014) (quoting *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994)).

¶28. Here, the chancellor classified a majority of the parties' property as marital, including, but not limited to, the marital home, bank accounts, investment accounts, home furnishings, and retirement accounts. As Darryl failed to provide the chancery court with a Rule 8.05 statement, much of the valuation was determined by Shirley's estimates.

¶29. Keeping those principles in mind, the chancellor is tasked with performing a *Ferguson* analysis by looking to the following factors:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
   a. Direct or indirect economic contribution to the acquisition of the property;
   b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
   c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

13

8.    Any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928.

¶30.    We provide a brief summary of the chancellor's findings for each factor:

### 1.    Substantial Contribution

¶31.    The chancellor held, "Both parties contributed to the accumulation of marital property throughout their long-term marriage and both contributed to the payment of marital expenses." Of note, the chancellor took "into consideration" the evidence presented showing Shirley's attempts to keep the family together despite Darryl's conduct. The chancellor "further consider[ed] the testimony that Darryl stopped paying marital expenses in August of 2021."

### 2.    Use of Assets

¶32.    The chancellor considered numerous pieces of information for this factor, such as Darryl's actions taken in 2021 when withdrawing from and closing accounts shared by the parties. The chancellor found he had "dissipated marital assets" concerning those actions. Darryl alleged that Shirley had dissipated assets as well regarding checks that were penalized when Darryl closed an account. The chancellor disagreed. Shirley had also asked that Darryl's use of marital funds to cover child support for his child born out of wedlock and legal funds after being terminated from JPD should be grounds for a larger portion of the estate. However, the chancellor also disagreed with that contention.

### 3.    Market and Emotional Value

¶33.    The chancellor acknowledged that the hearing did not yield much in the way of

14

emotional value of the assets, but Shirley had testified to the importance of some things to her, such as family photos and Christmas decorations. Darryl had not testified to such.

### 4. Separate Estates

¶34. The chancellor was provided with "little evidence" regarding the separate estates of both parties.

### 5. Tax and Legal Consequences

¶35. The chancellor noted the possibility of penalties for withdrawal or transferring of funds in the investment accounts and the couple's two adult children's "use and benefit[.]"

### 6. Alimony

¶36. The chancellor found that an equitable division of the marital property could indeed "eliminate a deficit between the parties and avoid the need for alimony."

### 7. Needs of Each Spouse

¶37. The chancellor recounted that both Darryl and Shirley were presently employed, and Darryl's failure to submit a Rule 8.05 statement to the court. Darryl received the marital home and two vehicles, all unencumbered by debt; therefore, the chancellor held that he "can maintain his current standard of living without support from Shirley." Shirley provided evidence of her present residence at a rental and her need to "secure permanent housing." As such, the chancellor "consider[ed] awarding Shirley a greater sum of the marital estate to account for her needs and to eliminate the need for alimony payments."

### 8. Other Factors

¶38. The chancellor did not consider additional factors here.

¶39. To be clear, our "standard of review regarding property division and distribution in divorce cases is **a limited one**." *Jenkins v. Jenkins*, 67 So. 3d 5, 8 (¶8) (Miss. Ct. App. 2011) (emphasis added) (citing *Oswalt v. Oswalt*, 981 So. 2d 993, 996 (¶11) (Miss. Ct. App. 2007)). We will uphold a chancellor's "division and distribution . . . if it is supported by substantial credible evidence." *Id.* Again, equitable distribution "is committed to the **discretion and conscience of the court**, having in mind all of the equities and other relevant facts and circumstances." *Woods v. Woods*, 423 So. 3d 720, 731 (¶34) (Miss. Ct. App. 2025) (emphasis added) (quoting *Hensarling v. Hensarling*, 824 So. 2d 583, 590 (¶21) (Miss. 2002)).

¶40. After review, this Court finds no indication that the chancellor's equitable distribution was an abuse of discretion. Each applicable *Ferguson* factor was analyzed in her determination, the most notable being that Darryl would retain the marital home, which would cause Shirley to remain in her current living situation, i.e., renting property. The chancellor was quite specific that Shirley's imminent efforts to secure a new home were considered in the final distribution of assets. Importantly, "equitable distribution **does not mean equal distribution**." *Faerber*, 150 So. 3d at 1005 (¶12) (emphasis added) (quoting *Brabham v. Brabham*, 950 So. 2d 1098, 1100 (¶7) (Miss. Ct. App. 2007)). The goal of equitable distribution is **equity**: it cannot simply be subject to an instant even split of marital property without a consideration of each case's facts and evidence. Here, we find the chancellor's decision is backed by substantial credible evidence, such as testimony and documents. We also note that Darryl never submitted a Rule 8.05 financial statement. We

16

find no error in the chancellor's decision not to award alimony.

## CONCLUSION

¶41.     This Court finds no manifest or clear error on the chancellor's part in granting Shirley a divorce based on habitual cruel and inhuman treatment or in making a finding that Darryl had engaged in adultery during their marriage.  We also find Darryl's claims concerning equitable distribution do not show reversible error and are without merit.  Therefore, we affirm the chancery court's final judgment of divorce.

¶42.     **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**